[Cite as *State v. Spencer*, 2015-Ohio-52.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                    CASE NO.  9-13-50

    v.

RANDY N. SPENCER,                         O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 13-CR-0247

**Judgment Affirmed**

**Date of Decision:   January 12, 2015**

APPEARANCES:

    *Kevin P. Collins* for Appellant

    *Angela Canepa and Jocelyn S. Kelly*  for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, Randy N. Spencer ("Spencer"), appeals the September 30, 2013 judgment of the Marion County Court of Common Pleas journalizing his conviction by a jury for four counts of Rape, in violation of R.C. 2907.02(A)(1)(b)/(A)(2), each a felony of the first degree. In addition, each conviction included a finding that the victim was less than ten years of age at the time of the offense. The trial court sentenced Spencer to a prison term of fifteen years to life on each count to be served concurrently. The trial court also classified Spencer as a Tier III Sex Offender.

{¶2} Spencer, a former Marion County Sheriff's Deputy, lived with his girlfriend Katelyn Currier ("Katie") and her four children. Spencer is the father of Katie's youngest child. Katie operated a daycare out of her home where she babysat L.N., the victim in this case. Katie began watching L.N. in November 2010 when she and Spencer lived in Caledonia, Ohio. In June of 2012, Katie and Spencer moved to nearby Marion, Ohio, and Katie continued to watch L.N. during the week. In October of 2012, Katie obtained a part-time job providing in-home care for an elderly person one day a week. With the permission of L.N.'s mother, Kim N. ("Kim"), Katie left Spencer in charge of L.N. and Katie's two youngest children while she worked outside the home. Katie also sometimes left the children with Spencer while she ran errands or visited a tanning salon.

{¶3} On April 10, 2013, at approximately 6:45 p.m., Kim was in the bathroom assisting L.N. with her bath when L.N. disclosed to her that Spencer sometimes puts his "pee-pee" in her mouth. L.N. was five-years-old at the time of this disclosure. Upon further inquiry by Kim, L.N. indicated that it happened "every once in a while" when Katie was tanning or at work. L.N. recalled the last occurrence was after Spencer and Katie took her to lunch at Buffalo Wild Wings the week before. L.N. explained to Kim that during this incident Spencer inserted his penis so far down her throat that it made her vomit. When further questioned by Kim, L.N. described Spencer's "pee-pee" as having "bloody lines." After gathering more details from L.N. about the incident, Kim called Katie, relayed L.N.'s disclosure regarding Spencer, and informed Katie that she was taking L.N. to the emergency room to be examined.

{¶4} Kim and L.N. arrived at Marion General Hospital sometime between 7:30 p.m. and 8:00 p.m. where they were met by L.N.'s father. The hospital staff informed Kim that their services were limited because more than 72 hours had passed since the last incident of abuse. Kim was instructed to return with L.N. in the morning when a SANE nurse was available to examine her. The hospital staff also advised Kim to contact the Sheriff.

{¶5} Kim immediately called the Marion County Sheriff's Office and was directed to bring L.N. to the department. There, Deputy Stacy Johnston conducted

an interview with L.N. in the presence of Kim and a caseworker from Children's Services. The interview was video recorded. L.N. was visibility shaken and reluctant to speak at the outset of the interview. To ease her fears, Deputy Johnston asked L.N. a series of yes or no questions about the incident. L.N. initially responded either by shaking her head indicating "no" or nodding her head indicating "yes." Deputy Johnston then asked L.N. if she had ever seen Spencer's "pee-pee?" L.N. nodded her head. Deputy Johnston followed up by asking "Did he touch you with his 'pee-pee' anywhere?" L.N. verbally responded, "In my throat." (Ex. F at 20:51). L.N. further stated that the last incident occurred in the hallway of the house while Katie was tanning on the day they went to Buffalo Wild Wings. L.N. also indicated that she vomited. The Children's Services caseworker recommended that Kim cancel the appointment with the SANE nurse at the local hospital and suggested that she take L.N. to the Child Assessment Center at Nationwide Children's Hospital in Columbus. Kim scheduled an appointment for the next day.

{¶6} On April 11, 2013, at 1:00 p.m., L.N. arrived at the Child Assessment Center and was interviewed a second time by a medical forensic examiner, Emily Combes. This time L.N. was alone with the interviewer. This interview was also video recorded and was observed by a nurse practitioner and a mental health advocate from the Child Assessment Center as well as the lead investigator from

the Ohio Bureau of Criminal Investigation ("BCI") assigned to the case. During this interview, L.N. stated that Spencer wanted "to touch his pee-pee on my throat." (Ex. H at 15:11). L.N. explained that Spencer referred to his "pee-pee" as a "hotdog" or a "toothbrush" and told her to put it in her mouth and suck on it. (Id. at 15:25, 15:50). She recalled that it happened "every once in a while" and "more than one time." (Id. at 16:15, 16:28). L.N. then stated, "One time when we went to Buffalo Wild Wings when we came back and Katie was tanning, and…when he put it too far down in my throat…I puked in the toilet." (Id. at 16:30).

{¶7} L.N. relayed that these interactions with Spencer occurred in the hallway, the bathroom, and the bedroom, and happened more than one time in each place in the house. She recalled a specific time in the bathroom where Spencer told her to "suck on the toothbrush" and then put his "pee-pee" in her mouth. (Ex. H at 18:27). L.N. also described an incident in the bedroom where Spencer again told her to "suck on the toothbrush" and then put his penis in her mouth. (Id. at 21:22). L.N. stated that when they were in the hallway Spencer told her to "suck on the hotdog" which also means "suck on the pee-pee." (Id. at 21:56). She explained that Spencer never directly told her to "suck on the pee-pee," but that he "lies" to her when he tells her that he is going to put the "toothbrush" or the "hotdog" in her mouth. (Id. at 22:45).

{¶8} L.N. recalled that Spencer would pull his pants part of the way down and instruct her to close her eyes before he puts his "pee-pee" in her mouth, but that sometimes she opened her eyes even "when he says not to open [her] eyes." (Ex. H at 31:29, 31:45). L.N. described the "pee-pee" as "long" and with "cracks of blood." (Id. at 32:00). She then drew a picture of the "pee-pee" and when asked by the forensic interviewer where the blood cracks were from, L.N. responded "probably from where he was growing." (Id. at 32:54). She explained that she knows the "pee-pee" is not a hotdog or a toothbrush because she can feel it on her tongue and "it feels like [she is] going to puke" when Spencer puts his "pee-pee" in her mouth. (Id. at 21:38, 19:25).

{¶9} L.N. recalled that the two other children in the house, ages 2 and 4, were usually in another room or outside on the trampoline, and that Katie was either tanning or at work when these encounters with Spencer occurred. She also confirmed that the last time she had to suck on Spencer's "pee-pee" was when they went to Buffalo Wild Wings. (Ex. H at 34:25). After the forensic interview, L.N. was examined by a nurse practitioner at the Child Assessment Center. The results of L.N.'s physical examination were "normal."

{¶10} On May 2, 2013, a search warrant was executed at Spencer's home by BCI. Five biological samples were collected—four from the wall in the hallway and one from a metal folding chair located in the master bedroom. Only

the sample from the master bedroom tested positive for semen. The semen was consistent with Spencer's DNA.

{¶11} On May 23, 2013, the Marion County Grand Jury indicted Spencer on seven counts of Rape, in violation of R.C. 2907.02(A)(1)(b)/(A)(2), each a felony of the first degree. Each count included a specification that the victim was under ten years of age at the time the offense occurred.

{¶12} On July 20, 2013, the trial court held a hearing regarding several pre-trial matters, including L.N.'s competency to testify at trial. At this hearing, the trial court conducted a voir dire of L.N. and found her competent to testify at trial.

{¶13} On September 10, 2013, the trial court held a six-day jury trial. Count One of the indictment was dismissed on the State's motion. Counts Two and Seven were dismissed by the trial court following the defense's Crim. R. 29 motion for acquittal. Accordingly, four counts of Rape remained for the jury to decide. The following testimony was presented to the jury at trial.

{¶14} L.N. was the first witness to testify for the prosecution. L.N. stated she was scared and demonstrated her reluctance to testify about the sexual abuse. When asked to identify Spencer, L.N. stated that she was too afraid to say Spencer's name but nevertheless identified Spencer as "Mia's Daddy,[1]" and stated that his first name began with an "R." L.N. also described Spencer as a

---

[1] Mia is the name of Spencer and Katie's child.

"policeman." L.N. stated that something "bad" occurred with "Mia's Daddy." (Tr. at 393-94).

{¶15} L.N. testified that the incidents with Spencer occurred in the hallway, Spencer's bedroom, and the bathroom. She identified two bathrooms in the house, one in Spencer's bedroom and one in the hallway, and stated that her interactions with Spencer occurred in "the bathroom in the hallway." (Tr. 397). L.N. indicated that the sexual abuse only happened in the Marion house and not in the house in Caledonia. The prosecutor showed L.N. photos of Spencer and Katie's house in Marion. When shown a picture of the bathroom in the hallway, L.N. stated "that's the bathroom where he would do things to me." (Tr. 402). For each location where the sexual abuse occurred, L.N. marked an "R" and an "L" on the photos to indicate the positions where she and Spencer were located when the sexual abuse occurred. L.N. described the incidents and stated that they both were standing at the time and that Spencer pulled his pants part of the way down before putting his "pee-pee" in her mouth. L.N. testified that Katie was not home when this happened.

{¶16} L.N. testified that the last time the abuse occurred was in the hallway. She recounted the incident after she ate lunch at Buffalo Wild Wings with Spencer and Katie and the two younger children. She recalled that she had French fries and mini corndogs and that Katie went tanning after lunch. L.N.

testified that she was in the hallway of the home with Spencer when Spencer told her to "let go" just prior to her vomiting. (Tr. 405). When the prosecutor asked her what Spencer told her to "let go" of L.N. stated that she was too afraid to say. L.N. eventually drew a capital letter "P" on a piece of paper. The following exchange took place:

> **Trial Judge: Let the record reflect that she drew what appears to be a Capital P.**
>
> **Prosecutor: And is that correct, [L.N.]? Is the judge right that is the letter P?**
>
> **L.N.: (Witness nods head).**
>
> **Prosecutor: Where was that?**
>
> **L.N.: (Witness indicating.)**
>
> **Prosecutor: Okay, you're pointing. You need to say out loud where it was, remember?**
>
> **L.N.: Mouth.**
>
> **Prosecutor: Mouth. Okay. P and—pardon me, what did you say, honey? I didn't hear that.**
>
> **L.N.: I got to write that again.**
>
> **Prosecutor: You can scribble it out if you need to. We don't have eraser on pens.**
>
> **L.N.: I know. Pens don't have erasers.**
> **(Indicating.)**
>
> **Prosecutor: Okay. So let me ask you this: What is this here?**

**L.N.: An M for mouth.**

**Prosecutor:  Okay and what is this?**

**L.N.:  Mouth.**

**Prosecutor:  Okay.  So you're labeling that as—is that your mouth or his mouth or someone else?**

**L.N.: My mouth.**

**Prosecutor: Okay. And you said it starts with the letter P.  Can you tell me your name for that?**

**L.N.:  (Witness indicating.)**

**Prosecutor:  So now there's two P's for that, so pee-pee, is that right?**

**L.N.:  Yes.**

**Prosecutor:  That's what you call it?**

**L.N.:  (Witness nodding.)**

**Prosecutor:  And where was the pee-pee right before he told you to let go?**

**L.N.: (Indicating.)  This mouth.  This and then this.**

**Prosecutor:  So the pee-pee was in your mouth?**

**L.N.: (Witness nodding).**

**Prosecutor:  Okay. And you said that that—that he told you to let go?**

**L.N.: (Witness nods head.)**

**Prosecutor:  And then what happened?**

Case No. 9-13-50

**L.N.: Then I ran to the toilet.**

(Tr. 409-11). The prosecutor continued direct examination with the following series of questions:

> **Prosecutor: And is that the same thing that he would do in the bathroom and in his bedroom or did he do other things to you in the bathroom or in the bedroom?"**
>
> **L.N.: That's the only thing he would do to me in the bathroom, the bedroom and the hallway.**
>
> **Prosecutor: And did it happen one time or more than one time in the hallway?**
>
> **L.N.: (Witness indicating.)**
>
> **Prosecutor: So what did you draw there?**
>
> **L.N.: More than one.**
>
> **Prosecutor: Is that how many times you think it happened in the hallway?**
>
> **L.N.: Um-hum.**
>
> **Prosecutor: And would Mia and Ethan always be in the playroom or would they sometimes be other places?**
>
> **L.N.: They would sometimes be in other places.**
>
> **Prosecutor: And what other places would they be?**
>
> **L.N.: They would be in the living room playing the Wii.**
>
> **Prosecutor: And did he ever—okay. How many times would you say that it happened in the bathroom?**

**L.N.: (Witness indicating.) Ten.**

**Prosecutor: Okay. So definitely more than one?**

**L.N: (Witness nodding.)**

**Prosecutor: And what about his bedroom?**

**L.N: (Witness indicating.)**

**Prosecutor: Okay.**

**L.N.: More than one.**

(Tr. 413-14). The prosecutor then asked L.N. to recall specific details of the incidents:

**Prosecutor: Did he tell you it was his pee-pee?**

**L.N.: Huh-huh.**

**Prosecutor: What did he tell you it was?**

**L.N.: A hotdog and a tooth brush.**

**Prosecutor: And what did he tell you to do with the hotdog?**

**L.N.: He told me to suck on it.**

**Prosecutor: Okay. Is that hard for you to talk about?**

**L.N.: (Witness nodding).**

**Prosecutor: And did he tell you to do anything with your eyes?**

**L.N.: Um-hum.**

**Prosecutor: What did he tell you to do with your eyes?**

**L.N.: Close them.**

**Prosecutor:  Did you close them?**

**L.N.:  Yes.**

(Tr. 418-19).

{¶17} On the stand, L.N. also discussed two pictures that she had previously drawn.  One L.N. drew during the forensic interview at the Child Assessment Center and the other she drew for the prosecutor the day before trial.  Both of these drawings depicted an oblong shape with lines.  L.N. stated these were drawings of Spencer's "pee-pee" and explained that the lines were "blood cracks" or "blood marks." (Tr. 420, 425).

{¶18} Kim N., L.N.'s mother, also testified for the prosecution and recalled L.N.'s initial disclosure to her on April 10, 2013.  Specifically, Kim testified that while giving L.N. a bath, L.N. stated that Spencer sometimes puts his "pee-pee" in her mouth.  Kim explained that she had L.N. repeat the statement two to three times to make sure she heard L.N. correctly.  L.N. told her that it happened every once in a while when Katie was at work or tanning and that it only happened in the new house in Marion.  L.N. further divulged that the last time it happened was after she had lunch with Katie and Spencer at Buffalo Wild Wings.  L.N. told Kim that Spencer put his penis so far down her throat that it made her "pukey."  (Tr.

502). Kim called Katie, who began to cry when Kim told her what L.N. had revealed. Katie then advised her to get more information from L.N.

{¶19} Kim testified that she then went back upstairs and began brushing L.N.'s hair as she nonchalantly asked L.N. if she knew where a "pee-pee" was located on the body. L.N. pointed and replied "yes." Kim then asked L.N. if she knew what "pee-pee" looked like and L.N. replied, "yes, mom, it's got bloody lines on it." (Tr. 487). Kim called Katie again to tell her that she was taking L.N. to the emergency room at the local hospital. At the hospital, L.N. was examined and an appointment with a SANE was scheduled for the following morning.

{¶20} Kim testified that she drove L.N. directly to the Marion County Sheriff's Office from the hospital, where both she and L.N. gave statements to a Deputy and a caseworker from Children's Services. L.N. was not present when Kim gave her statement. However, Kim was in the room seated next to L.N. and holding her hand while she was interviewed by the Deputy. Upon the advice from the Children's Services caseworker, Kim canceled the appointment with the SANE nurse and arranged for L.N. to be examined at the Child Assessment Center the next day. Kim explained that she was not permitted to observe the forensic interview of L.N. at the Child Assessment Center. Kim recalled that after the forensic interview, L.N. was examined by a nurse practitioner.

**{¶21}** Kim observed that L.N.'s demeanor noticeably changed when L.N. talked about the incident. Kim stated that L.N. exhibited signs of stress upon having to appear in court to face Spencer. Specifically, Kim recalled that after L.N. completed the competency hearing she began wetting the bed at night and continued to have issues for about two weeks after the hearing.

**{¶22}** The next witness to testify was Deputy Stacy Johnston of the Marion County Sheriff's Office. Deputy Johnston testified that on the night of L.N.'s disclosure she was called in from road patrol to take statements from Kim and L.N. because she was the only female on duty. She recalled taking Kim's statement first without L.N. present, during which Kim related L.N.'s disclosure regarding Spencer. Deputy Johnston then spoke with L.N. while Kim was still in the room. Both Kim's and L.N.'s interviews were video recorded. The video recording of Deputy Johnston's conversation with L.N. and Kim was played for the jury. (Tr. 562, Ex. F). Deputy Johnston explained that after she completed the report she had nothing further to do with the case due to the fact that she used to work with Spencer before he was laid off as a Deputy in 2012, which created a conflict of interest.

**{¶23}** On cross-examination, Deputy Johnston admitted that she is only trained in general interviewing techniques and has not received specialized training in interviewing children who are victims of sexual abuse. However,

Deputy Johnston explained that the purpose of her interviews with L.N. and Kim was to ascertain the basic facts and pass the case along to the forensic interviewer at the Child Assessment Center.

{¶24} Major Jeff Cline of the Marion County Sheriff's Office was the next witness to testify. Major Cline related Spencer's prior employment history with the Marion County Sheriff's Office. Specifically, that Spencer was hired as a dispatcher in 2007 or 2008 and then laid off due to budget constraints in 2009. Spencer was later called back and offered a position as a road patrol Deputy and then was again laid off in January 2012 for fiscal reasons. Major Cline recalled that Spencer's most recent positions were with the Delaware County Sheriff's Office as a corrections officer and with the Marion County Sheriff's Office's auxiliary unit.

{¶25} Major Cline testified that Spencer called him at home at 9:00 p.m. on April 10, 2013, the night of L.N.'s disclosure. Major Cline recalled that Spencer was very upset and asked to speak to him immediately. They met shortly thereafter and Spencer relayed to him that the five year old girl his girlfriend watches accused him of a sex act—specifically of putting his penis in her mouth on more than one occasion. Spencer denied the accusations. Major Cline also spoke to Katie that night regarding the allegations. Major Cline placed Spencer on

administrative leave and asked for his badge and gun. He explained that BCI then took over the case due to the conflict of interest with the Sheriff's Office.

{¶26} The prosecution also presented the testimony of Emily Combes, a licensed social worker employed at the Center for Family Safety and Healing at Nationwide Children's Hospital, who conducted the forensic interview of L.N. Ms. Combes testified that she has extensive training in dealing with children. She estimated that she conducts 10 to 15 interviews a week and that in a three year period she has conducted over 800 interviews of sexually abused children. Ms. Combes was recognized as an expert in the area of forensic interviewing of children at trial.

{¶27} Ms. Combes testified that on April 11, 2013, she conducted an interview of L.N. at the Child Assessment Center, which was video recorded. She recalled that a BCI agent, a nurse practitioner, and a mental health advocate observed L.N.'s interview from another location. She stated that during the initial phase of the case law enforcement or Children's Services will typically conduct a "minimal facts interview" prior to her conducting the forensic interview. Ms. Combes stated that her role as a forensic interviewer is to record what the child says, and not to investigate or discern if the statements are true. She described the forensic interview as an "interview of a child that is done in a neutral, non-leading

way." (Tr. 698). The video recording of Ms. Combes' forensic interview of L.N. was played for the jury. (Tr. 687, Ex. H).

{¶28} Ms. Combes opined that based on the type of questions she asked L.N. and the responses elicited, she did not believe L.N. was suggestible during the interview. She pointed to the fact that L.N. was able to recall specific details of the incident after Buffalo Wild Wings and was also able to provide a free narrative regarding Spencer touching her throat with his "pee pee." Ms. Combes acknowledged that children can be coached to make certain statements, but maintained that it is very difficult to do with young children. She stated that when children recall idiosyncratic details, as L.N. did during the interview, being coached by someone seems less likely because it is difficult for a young child to discuss something they have not experienced personally. Ms. Combes explained that in her experience it is challenging for a young child to remember all the things that need to be provided in a forensic interview and it is also difficult for a person to be able to anticipate all the questions asked by a forensic interviewer in order to seamlessly coach a child.

{¶29} The prosecution also presented the testimony of Judy Mount, the victim advocate assigned to L.N.'s case. She stated that part of her role was to explain the courtroom procedure to L.N. and to help her prepare for what would be expected from her at trial. Ms. Mount recalled a meeting that she had in the

courtroom with L.N. and the two prosecutors trying the case just prior to the commencement of the trial. L.N.'s parents were waiting in the lobby and not present during this meeting. At this time, L.N. spoke about her encounters with Spencer. Ms. Mount remembered L.N. drawing a picture of the "pee-pee" and a picture of a hotdog. L.N. described the difference between the "pee-pee" and the hotdog was that the "pee-pee" had "blood lines" on it and the hotdog did not. L.N. also stated she had to open her mouth really, really wide during an incident with Spencer and that is how she knew the "pee-pee" was not a hot dog.

{¶30} Gail Horner, a Pediatric Nurse Practitioner at the Child Assessment Center, also testified for the prosecution and was declared an expert in child sexual assault examinations at trial. She recalled examining L.N. on April 11, 2013, after the forensic interview with Ms. Combes, which she observed. Nurse Horner completed a report regarding her examination of L.N. and found that there were no signs of trauma to L.N.'s anus or vagina. However, she explained that in sexual abuse cases, "trauma in the mouth is very, very unusual * * * there's usually just no trauma from a penis going in the mouth." (Tr. 1369). Nurse Horner further stated that when there is a lack of physical finding during the exam, the diagnosis of sexual abuse is determined by the history that the child gives. She testified that "based on the very consistent history of sexual abuse that [L.N.] gave during her

forensic interview" she diagnosed L.N. to have indeed suffered from sexual abuse. (Tr. 1355).

{¶31} Nurse Horner also provided testimony regarding her opinion on the visibility of veins or blood vessels on a penis. She explained that the blood vessels would be more visible when they became engorged as the penis grew erect and that they would be less visible on a flaccid penis. On cross-examination, she was asked to give an opinion of the pictures that L.N. drew of the "pee-pee." She acknowledged that L.N. never used the words blood vessels or veins, but she stated that she would not expect a five-year-old to know that terminology. Rather, she believed L.N.'s statements regarding "cracks of blood" to be describing blood vessels or veins. (Tr. 1384).

{¶32} Julie Kenniston, Director of Training and Education at Butler County Job and Family Services, testified as an expert for the prosecution. Ms. Kenniston testified that she has conducted 3,000 forensic interviews of children who have been sexually abused and was qualified as an expert in the area of forensic interviews of children. Ms. Kenniston reviewed and analyzed the video recordings of the Deputy Sheriff's interview of L.N. and of L.N.'s forensic interview conducted by Ms. Combes.

{¶33} With regard to L.N's first interview with Deputy Johnston, Ms. Kenniston observed that the interview was short and consisted of mostly closed-

ended questions requiring a one to two word response. However, Ms. Kenniston noted that L.N. answered "no" to 13 of these questions, "yes" to 10, and even provided a more elaborate answer to the question, "Did he touch you anywhere with his pee-pee?" by responding "In my throat." (Tr. 1133). Ms. Kenniston explained that the pattern of L.N.'s responses is "hugely significant" when assessing her suggestibility. (Id.). Specifically, she stated that "the fact that in 13 questions, she responds 'no' shows that [L.N.], even at five years old, was not just saying 'yes' because she was trying to please the interviewer or give information." (Id.).

**{¶34}** Ms. Kenniston acknowledged that Kim's presence while seated next to L.N. during the interview was not the best practice for forensic interviews, but she noted that Deputy Johnston's interview was not a forensic interview. Based on her review of the video recorded interview, Ms. Kenniston did not think that Kim's presence influenced L.N.'s answers. She observed Kim as simply providing L.N. with support to be able to answer the Deputy's questions rather than telling L.N. how she should respond. Ms. Kenniston opined that despite the flaws of the Deputy's interviewing technique, L.N. appeared committed to making sure that the information she had was accurately being shared. In her opinion, there did not appear to be suggestibility or confusion on L.N.'s part during the interview.

{¶35} Regarding L.N.'s second interview with Ms. Combes at the Child Assessment Center, Ms. Kenniston described the protocol used by the forensic interviewer as a nationally recognized standard for forensic interviewing of children. Again, she was struck by L.N.'s responses to the yes/no questions—in particular by the fact that she answered "no" to the first nine and then "yes" to the last one and was also able to provide additional information to support her answer. Ms. Kenniston discussed instances during the interview in which L.N. provided narrative responses and spontaneous details, which indicate coaching by someone else was unlikely. She was impressed by the fact that L.N. told the same story to the adults in two totally different interview processes and relayed it in such a manner that the adults in both scenarios could ascertain that something needed to be further explored.

{¶36} Special Agent Eva Hall testified that she was contacted by the Marion County Sheriff's Office to handle the case due to a conflict of interest. She observed L.N.'s forensic interview at the Child Assessment Center. She then proceeded with the investigation of Spencer, which included executing a search warrant on May 2, 2013, at the home Spencer and Katie shared. Agent Hall explained that BCI collected evidence from the home and also took DNA samples from Spencer and L.N.

{¶37} The prosecution also presented the testimony of three BCI employees who were involved in the collection, testing, and identification of the five biological samples taken from Spencer's home. Four of the samples were taken from stains found on the wall in the hallway and one was taken from a metal folding chair found in the bedroom that Spencer shared with Katie. The testimony revealed that only the sample from the metal folding chair contained DNA content which was determined to be consistent with semen belonging to Spencer. There was no DNA identified as belonging to L.N. in the samples taken from the scene.

{¶38} In his defense, Spencer presented the expert testimony of Dr. Jeffrey Smalldon, a forensic psychologist. Dr. Smalldon reviewed the video recordings of the interviews with L.N. at the Sheriff's Office and at the Child Assessment Center. He provided testimony criticizing Deputy Johnston's interview of L.N. by noting that Deputy Johnston did not follow the appropriate protocols for eliciting information from young children—in particular that she asked L.N. a series of yes/no questions, which in his opinion produce inaccurate responses. Dr. Smalldon also determined that Deputy Johnston's interview of L.N. was flawed because Kim was present. Dr. Smalldon further discussed how a flawed interview could shape a child's thoughts or perception making any subsequent statement by the child unreliable or suspect. Dr. Smalldon also critiqued the questioning protocol used during the forensic interview at the Child Assessment Center and

stated that in his opinion Ms. Combes failed to explore "alternative hypotheses," other than sexual abuse, to explain L.N.'s statements.

{¶39} On cross examination, Dr. Smalldon admitted that he is not an expert in forensic interviewing of children nor does he conduct these types of interviews. He stated that his experience is derived primarily from custody cases concerning the allocation of parental rights and responsibilities and that if an allegation of sexual abuse did arise the matter would be taken completely out of his hands and passed on to the appropriate authorities.

{¶40} The defense also presented the testimony of Janine Bright. Janine testified that beginning in the fall of 2012 Katie watched her kids during the week by helping them get to and from school and would watch them during the day if there was no school. She recalled that besides Katie's youngest two children, L.N. was the only other child regularly at the home during the day. She testified that when she dropped off her children in the mornings she would see L.N. at the house and never noticed her acting shy or fearful of Spencer.

{¶41} Katie also testified for the defense. Katie stated that she watched L.N. Monday through Friday from 7:30 a.m. to 4:00 p.m. Katie recalled that in October of 2012 she began providing in-home care to an elderly person in Findlay one day a week. Katie explained that prior to taking this job Kim gave her permission to leave L.N. in Spencer's care while she was out of the home. Katie

estimated that it took approximately 45 to 50 minutes for her to get to her client's home. She generally left the house at 9:00 a.m. and returned by noon. Katie's work records were presented at trial and she testified that she worked a total of 23.5 hours from October 2012 to April 2013.

{¶42} Katie recalled the day that she and Spencer took the children to Buffalo Wild Wings. She stated it was on April 4, 2013, which was a Thursday and that she worked outside of the home that morning. On her way home, she met Spencer, L.N., Ethan, and Mia at Buffalo Wild Wings. She remembered the children eating French fries and mini corn dogs and acting normal. She decided to go tanning after lunch. She stated that she tried to go tanning every day. The records from the tanning salon were presented as an exhibit at trial. The tanning salon records indicated that she entered the tanning salon on that day at 1:27 p.m. and tanned for 12 minutes. Katie testified that she lived two to three minutes from the tanning salon and estimated that she returned to the house around 1:50 p.m. She recalled that when she arrived home Spencer told her that L.N. had vomited. Spencer showed her the location where L.N. vomited in the hallway between the master bedroom and the hallway bathroom.

{¶43} Katie testified that she received a phone call from Kim on April 10, 2013, at 7:08 p.m., during which Kim told her about L.N.'s disclosure—specifically that L.N. said that Spencer put his "pee-pee" in her mouth. L.N told

Kim it happened "every once in a while." L.N. had told Kim that it happened while Katie was tanning. Kim also told her that L.N. described the "pee-pee" as having bloody cracks, which represented veins. (Tr. 1598).

{¶44} Katie also provided testimony regarding their typical schedule during the week. She explained that either she or Spencer would take L.N., Ethan, and Mia to preschool at the YMCA, where they would be from 9:15 a.m. until noon, Monday through Friday. Katie also testified that Spencer worked second shift, 3:00 p.m. to 11:00 p.m., as a corrections officer in Delaware County and would typically leave the house around 2:00 p.m. Spencer worked five days a week and had Mondays and Tuesdays off in 2013, and Tuesdays and Wednesdays off in 2012. Katie also testified that she and Spencer have had sex in the metal chair in the master bedroom where Spencer's semen was found.

{¶45} Spencer was the last witness to testify for the defense. He recalled April 4, 2013, the day he and Katie took L.N. and the other children to Buffalo Wild Wings. He remembered taking L.N., Ethan, and Mia to the YMCA in the morning and then meeting Katie for lunch. After lunch, Katie decided to go tanning. Spencer recalled being perturbed by Katie's decision because he had to get ready to leave for work at 2:00 p.m. Spencer stated he arrived home with children and situated them in the living room while he went into the bedroom to change for work. He stated that L.N. came to the bedroom door and informed him

that she did not feel well. She then vomited in the hallway. Spencer stated he walked L.N. to the hallway bathroom where she finished vomiting. He recalled asking L.N. if she was alright and she responded with a smile and stated that she must have eaten too many French fries. He then wiped her mouth and walked her back to the living room. He testified that he cleaned up the vomit in the hallway and asked L.N. again if she was alright, at which time Katie had arrived home and he explained to her what had happened. He stated that he finished getting dressed and left for work around 2:00 p.m.

{¶46} Spencer maintained he was shocked to learn from Katie that L.N. had accused him of sexually abusing her. On the stand, he denied ever touching L.N. with his penis, including putting his penis in her mouth.

{¶47} After hearing the evidence presented, the jury found Spencer guilty on all four of the Rape charges, including the additional finding that the victim was under the age of ten at the time of the offense. The trial court subsequently sentenced Spencer to a prison term of fifteen years to life on each count of Rape to be served concurrently and classified him as a Tier III Sex Offender.

{¶48} Spencer now appeals, asserting the following assignments of error.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AND DENIED HIM DUE PROCESS OF LAW AS GUARENTEED [SIC] BY THE UNITED STATES CONSTITUTION AND THE OHIO**

**CONSTITUTION BY FINDING L.N. COMPETENT TO TESTIFY.**

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AND DENIED HIM DUE PROCESS OF LAW AS GUARENTEED [SIC] BY THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION BY COMPROMISING ITS ROLE AS AN IMPARTIAL TRIBUNAL.**

### ASSIGNMENT OF ERROR NO. III

**DEFENDANT-APPELLANT'S CONVICTIONS FOR RAPE ARE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE CONSTITUTIONS OF OHIO AND THE UNITED STATES.**

### ASSIGNMENT OF ERROR NO. IV

**THE COMBINATION OF THE AFOREMENTIONED ERRORS ARE SUFFICIENT TO CALL INTO QUESTION THE VALIDITY OF THE VERDICT, PREVENTING THE APPELLANT FROM OBTAINING THE FAIR TRIAL GUARANTEED BY THE FIFTH AND SIXTH AMENDMENTS TO THE U.S. CONSTITUTION AS MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT, AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.**

{¶49} For ease of discussion, we elect to address the assignments of error out of order.

### *First Assignment of Error*

{¶50} In his first assignment of error, Spencer argues that the trial court erred in finding that L.N. was competent to testify at trial. Specifically, he

maintains that the record fails to establish that L.N. was able to discern the difference between the truth and a lie and understand the concept of truthfully relating events.

{¶51} Evid.R. 601 provides: "Every person is competent to be a witness except: (A) * * * children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

{¶52} A trial court must conduct a voir dire examination of a child under ten years of age to determine the child's competence to testify. In making this determination, the court must consider:

> **(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful.**

*State v. Maxwell*, 139 Ohio St.3d 12, 33, 2014-Ohio-1019, ¶ 100, quoting *State v. Frazier*, 61 Ohio St.3d 247, 251 (1991). It is well-settled that, as the trier of fact, trial judges are required to make a preliminary determination as to the competency of all witnesses, including children, and that absent an abuse of discretion, competency determinations of the trial judge will not be disturbed on appeal. *See State v. Clark*, 71 Ohio St.3d 466, 469 (1994), citing *Frazier*, 61 Ohio St.3d at 251. A trial court is given wide latitude in determining whether a prospective

witness is competent to testify. *Clark* at 469-70. The trial judge has the opportunity to observe the child's appearance, manner of responding to questions, general demeanor, and ability to relate facts accurately and truthfully. *Frazier* at 251.

{¶53} On July 20, 2013, the trial court held a hearing to determine L.N.'s competency to testify. L.N. was five years old when she testified and she was three years old when Katie began babysitting her in November of 2010. During the voir dire examination to determine her competency, L.N. stated her mother's name and that she lived with her. She was also able to recall the different addresses where she had lived in Caledonia. She mentioned that she attended preschool at the YMCA in the morning on "certain days"—Monday, Wednesday and Friday and stated the names of her four preschool teachers. (Tr. 20). She expressed excitement about starting Kindergarten and her upcoming birthday. She stated that some of her favorite toys were Barbies "because we can dress them up." (Tr. 23). She also recalled the costume she wore for Halloween and specific gifts that she received at Christmas the year before.

{¶54} On appeal, Spencer cites a number of L.N.'s answers from the competency hearing in support of his claim that L.N. was incompetent to testify. In these initial responses, L.N. appears not to understand the difference between the truth and a lie or the concept of truthfully relating events. However, after

further inquiry from the trial court, L.N. provided the following responses demonstrating that she understood the concept of truthfulness and knew that there were consequences for not telling the truth:

> **Trial Court: If I said I want you to be honest with me or tell the truth, would that be a good thing or a bad thing?**
>
> **L.N.: Good thing.**
>
> **Trial Court: Okay. And have you ever gotten in trouble for not telling the truth?**
>
> **L.N.: Yes.**
>
> **Trial Court: Okay what happens if you don't tell the truth?**
>
> **L.N.: You get in trouble.**
>
> **Trial Court: Okay. What—how did you get in trouble? Who do you get in trouble with?**
>
> **L.N.: Mommy.**
>
> **Trial Court: With mom. So mom wants you to tell the truth?**
>
> **L.N.: Yes.**
>
> **\* \* \***
>
> **Trial Court: If—let's say at preschool if you told the teacher that somebody did something they didn't do, could they maybe get in trouble for that?**
>
> **L.N.: Yes.**
>
> **Trial Court: And would that—if they got in trouble for something because you didn't tell the truth, would that be good or bad?**

**L.N.: Bad.**

**\* \* \***

**Trial Court: Do you think I'd be unhappy if you didn't tell the truth?**

**L.N.: Yes.**

**Trial Court: Okay. So if you testify, you get to answer questions here, can you promise us that you'll tell the truth?**

**L.N.: Yes.**

**Trial Court: Okay. And you think that would be a good thing to tell the truth?**

**L.N.: Yes.**

**Trial Court: And do you understand that it's real, real important that you tell the truth when you're here in court?**

**L.N.: Yes.**

**Trial Court: Okay. It's important all the time to tell the truth, but it's really, really important here, okay? Do you understand that?**

**L.N.: Yes.**

(Tr. 25-30).

**{¶55}** The Supreme Court of Ohio has stated that "a child may be competent to testify even though the child is unable to recollect some facts or initially does not recognize the concept of truth, so long as other answers demonstrate that the child can perceive and recall generally and understands the

concept of truthfulness." *State v. Fry*, 125 Ohio St.3d 163, 175, 2010-Ohio-1017, ¶ 76, citing *State v. Anderson*, 154 Ohio App.3d 789, 2003-Ohio-5439, ¶ 62 (finding six-year-old witness competent even though she answered some questions wrong); *See also*, *Prado v. Elsayed*, 2d Dist. Montgomery No. 24528, 2012-Ohio-290, ¶ 42 (stating a child can be found competent even when the child is initially "unable to recollect some facts or initially does not recognize the concept of truth, so long as the voir dire continues on to demonstrate that the child can perceive and recall generally and understands the concept of truthfulness").

{¶56} Here, the record reflects that L.N. seemed confused and had initial difficulty answering some of the specific questions posed by the trial court. However, as evidenced from the transcript excerpts above, her follow-up responses to other questions clearly demonstrated that she knew the difference between truth and falsity and understood that she should tell the truth. Therefore, we conclude that L.N. exhibited sufficient ability to receive, recall and communicate accurate impressions of fact, understand truth and falsity, and appreciate the responsibility to tell the truth as required under Evid. R. 601(A). Accordingly, we do not find the trial court abused its discretion in finding L.N. competent to testify. Spencer's first assignment of error is overruled.

### *Third Assignment of Error*

**{¶57}** In his third assignment of error, Spencer contends that his convictions for Rape were against the manifest weight of the evidence. In reviewing whether a verdict was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "To 'reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required.' " *State v. Miller*, 96 Ohio St.3d 384, 2002–Ohio–4931, ¶ 38, quoting *Thompkins*, paragraph four of the syllabus.

**{¶58}** In this case, Spencer was charged with four counts of Rape, in violation of R.C. 2907.02(A)(1)(b)/(A)(2), which reads as follows:

> **(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:**

**(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.**

**(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force**.

**{¶59}** Spencer makes several arguments in support of his contention that his convictions were against the manifest weight of the evidence. At the outset, we note that Spencer claims L.N.'s competency was minimal. However, given our resolution of the first assignment of error, we do not find this argument persuasive. Spencer also asserts that L.N.'s testimony at trial was internally inconsistent and inconsistent with her prior interviews. Spencer cites the following specific examples on appeal.

**{¶60}** At trial, L.N. testified that she first told Kim about the sexual abuse while they were on the way to the zoo and not in the bathroom as stated by Kim. Kim testified that since her initial disclosure, L.N. talked to her several times about the case, including while they were riding in the car. Kim could not recall specifically if they were going to the zoo at the time these conversations occurred, but stated that they had been to the zoo twice since the case begun.

**{¶61}** Spencer also points to the fact that L.N. testified that she never went to the hospital after telling Kim about the sexual abuse. However, Kim testified that when she took L.N. to the emergency room on the night L.N. disclosed the

sexual abuse, she made a concerted effort not to alarm L.N. and did not tell her that they were going to the hospital. Rather, she simply told L.N. that they were going for a "ride." (Tr. 491). Kim testified that once they were at the hospital, she "mouthed" L.N.'s disclosure to the medical staff while in L.N.'s presence and she was careful not to mention her concerns about sexual abuse in front of L.N. (Tr. 493). The record also reflects that L.N. was in the process of being treated for a urinary tract infection at the time she made her initial disclosure and continued to experience discomfort from that condition.[2] When L.N. was taken to the Child Assessment Center, which is an outpatient clinic at the hospital, she told Ms. Combes during the forensic interview that she believed that she was there because her "pee-pee" hurt.

{¶62} In addition, Spencer claims that L.N. made inconsistent statements about the reason why she vomited after lunch at Buffalo Wild Wings. On direct examination, L.N.'s testimony revealed that she vomited as a result of Spencer putting his penis too far down her throat. On cross-examination, the follow exchange occurred:

> **Defense Counsel: Didn't that day really what happened is you got sick on French fries, truthfully?**
>
> **L.N.: Um-hum.**

---

[2] The record demonstrates that L.N.'s urinary tract infection was coincidental and not thought to be related to L.N.'s interactions with Spencer.

**Defense Counsel:  You got sick on French fries, really, didn't you?**

**L.N.:  (Witness nods head.)**

**Defense Counsel:  It didn't have anything to do with the pee-pee, did it?**

**L.N.: No.**

**Defense Counsel:  It was the French fries?**

**L.N.:  (Witness nodding.)**

**Defense Counsel:  And you then threw up in the toilet?**

**L.N.:  (Witness nods head.)**

**Defense Counsel:  And you threw up because of the French fries, not because of any pee-pee, did you?**

**L.N.: (Witness shakes head.)**

**Defense Counsel: That's the truth isn't it?**

**L.N.: (Witness nodding.)**

(Tr. 452).  On re-direct examination, the prosecutor attempted to clarify L.N.'s testimony:

**Prosecutor:  Okay.  You said that Randy had told you to let go right before you threw up?**

**L.N.: Um-hum.**

**Prosecutor:  What were you letting go of?**

**L.N.: (Witness indicating.)**

**Prosecutor: And you're pointing to the pee-pee on your body. Was it the pee-pee on your body or the pee-pee on somebody else's body?**

**L.N.: (Witness indicating.)**

**Prosecutor: And you're pointing—Your Honor, if the record could reflect that she's pointing at Mr. Spencer?**

**Trial Court: Okay, so reflected.**

**Prosecutor: And where was it? Where was it when you let go of it?**

**L.N.: (Witness indicating.)**

**Prosecutor: And you're pointing to—**

**L.N.: (Witness indicating.)**

**Prosecutor: Is that your mouth?**

**L.N.: (Witness nodding.)**

**Prosecutor: Okay. And, Your Honor, I would request that the record—**

**Trial Court: The record will reflect that the witness was pointing to her mouth, and was pointing to her mouth before counsel confirmed that.**

**Prosecutor: Okay. And when you threw up, what came out into the toilet?**

**L.N.: Food that was already chewed up.**

**Prosecutor: Okay. And did you recognize any of the food? Could you tell what it was?**

**L.N.: All I seen was French fries.**

> **Prosecutor:  Okay.  So you threw up the French fries you had eaten?  [L.N.], you threw up the French fries you had eaten?**
>
> **L.N.: Um-hum.**

(Tr. 453-54).

{¶63} In extracting these specific statements made by L.N. from the entire transcript, Spencer is attempting to detract attention from the fact that both at trial and during the two prior interviews, five-year-old L.N. consistently related specific details of the sexual abuse.  In recounting of the episodes of sexual abuse, L.N. consistently: (1) identified Spencer as the perpetrator; (2) identified each location in the house where the abuse occurred and stated that the abuse occurred "more than one time;" (3) recalled that Spencer pulled his pants part of the way down; (4) stated that Spencer referred to his penis as a "toothbrush" or a "hotdog" and told her to put it in her mouth and suck on it; and (5) described Spencer's "pee-pee" as having "bloody cracks."  Notably, L.N. drew two similar pictures depicting the "pee-pee" with "bloody cracks," one on April 11, 2013—the day after her initial disclosure and the other over five months later on the day before at trial.  L.N. was also able to recall on multiple occasions the specific incident of sexual abuse that occurred after eating lunch at Buffalo Wild Wings in clear detail.  Moreover, the details L.N. divulged during her initial spontaneous disclosure to

Kim were consistent with her recollection during the two interviews hours later and her testimony at trial after several months had passed.

{¶64} As the finder of fact, it was within the province of the jury to assess L.N.'s credibility and to determine the appropriate weight to be given to these statements. Thus, when the excerpts of L.N.'s testimony selected by Spencer on appeal are taken out of isolation and viewed within the context of the entire transcript, we cannot find that these statements alone are an appropriate basis for reversing Spencer's convictions on the manifest weight of the evidence.

{¶65} Spencer also argues under this assignment of error that the "minimal facts interview" conducted by Deputy Johnston and the forensic interview conducted by Emily Combes were flawed, rendering the evidence used to convict him unreliable. Spencer generally asserts that the interviews were deficient due to Kim's presence during Deputy Johnston's interview of L.N., the use of leading questions during both interviews, and the failure of both interviewers to utilize certain interviewing techniques. Notably, Spencer fails to articulate any specific argument to support this contention. Nevertheless, the record demonstrates that the reliability of the techniques used by Deputy Johnston and Emily Combes in interviewing L.N. were thoroughly litigated by both sides in this case. The prosecution and defense each presented an expert who addressed the precise issues raised by Spencer on appeal and who formulated differing opinions as to the

soundness of the protocols used during the interviews. The assessment of the weight to be afforded to each of these expert opinions was left to the sound discretion of the jury and, therefore, we find no error with the jury's determination on this basis.

{¶66} Finally, Spencer argues that his convictions were against the manifest weight because there was no physical evidence corroborating L.N.'s allegations of sexual abuse and the timeline of the alleged incidents made it nearly impossible for the abuse to have happened. The prosecution presented evidence that Spencer's semen was found on a metal folding chair near the location where L.N. identified the abuse to have occurred. In addition, Nurse Horner testified that a lack of physical findings did not negate the history of sexual abuse given by L.N., especially when the abuse involves fellatio and the last incident is reported to have occurred a week earlier. Moreover, "[i]t is well settled that a rape conviction may rest solely on the victim's testimony, if believed, and that '[t]here is no requirement that a rape victim's testimony be corroborated as a condition precedent to conviction.' " *State v. Patterson*, 8th Dist. Cuyahoga No. 100086, 2014-Ohio-1621, ¶ 40, citing *State v. Lewis*, 70 Ohio App.3d 624, 638, (4th Dist.1990).

{¶67} In addition, the evidence at trial established that over the course of several months Spencer spent a significant period of time with L.N. without Katie

or another adult present, including the approximately twenty minutes to a half an hour after the lunch at Buffalo Wild Wings when Katie went tanning. Accordingly, the record supports that there was ample opportunity for the sexual abuse to have occurred as L.N. alleged. Based on the foregoing, we do not find that Spencer's convictions were against the manifest weight of the evidence and his third assignment of error is overruled.

*Second Assignment of Error*

{¶68} In his second assignment of error, Spencer argues that the trial court made statements in the presence of the jury that denied him a fair trial. R.C. 2945.03 governs a judge's control of a trial and states that "[t]he judge of the trial court shall control all proceedings during a criminal trial, and shall limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue." In addition, Evid.R. 611(A) provides that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Evid.R. 614 further permits the court to "interrogate witnesses, in an impartial manner, whether called by itself or by a party."

{¶69} The Sixth Amendment to the United States Constitution guarantees a defendant the right to a trial by fair and impartial jurors. *State v. Oliver*, 11th Dist. Portage No. 2010-P-0017, 2012-Ohio-122, ¶ 37, citing *Irvin v. Dowd*, 366 U.S. 717 (1961). In exercising his duty to control a criminal trial, the trial judge is to remain impartial and refrain from making comments which may influence a jury. *State v. Boyd*, 63 Ohio App.3d 790, 794 (1989). "[T]he judge must be cognizant of the effect of his comments upon the jury[.]" *State v. Wade*, 53 Ohio St.2d 182, 187 (1978), vacated and remanded on other grounds. "[T]he Court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness." *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113 (1970), at paragraph three of the syllabus. Furthermore, "juries are highly sensitive to every utterance by the trial judge." *Wade* at 188.

{¶70} In deciding whether a trial judge's comments were appropriate, we must determine whether the comments were prejudicial to the defendant's right to a fair trial. *Wade*, 53 Ohio St.2d at 188. "Where a jury might infer the court's opinion of a witness through the persistence, tenor, range, or intensity of its questions, the interrogation is prejudicially erroneous. While the court can ask neutrally phrased questions, its questions should not suggest disbelief in a witness's testimony." *State v. Prokos*, 91 Ohio App.3d 39, 44, citing *State ex rel.*

*Wise v. Chand*, 21 Ohio St.2d 113 at paragraph four of the syllabus. The Supreme

Court of Ohio established that the following factors must be considered when

determining whether a trial judge's remarks were prejudicial:

> **(1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.**

*Wade* at 188.

{¶71} Generally, a court reviewing a trial court's interrogation of witnesses

and comments must determine whether the trial court abused its discretion. *State*

*v. Davis*, 79 Ohio App.3d 450, 454 (4th Dist.1992). However, the failure to object

to the content of the judicial statements as being prejudicial to the appellant's

rights has been held to constitute a waiver of the error and arguably precludes

consideration of the issue upon appeal, for, absent an objection, the trial judge is

denied an opportunity to give corrective instructions as to the error. *Wade*, 53

Ohio St.2d at 188, citing *State v. Williams*, 39 Ohio St.2d 20 (1974). Accordingly,

any errors not brought to the attention of the trial court by objection or otherwise

are waived and may not be raised on appeal unless they rise to the level of plain

error. *Hamilton v. Clemans*, 121 Ohio App.3d 337, 339 (12th Dist.1997), citing

*State v. Williford*, 49 Ohio St.3d 247, 251 (1990). To constitute plain error, it must

appear from the record that an error occurred and that except for that error the outcome of the trial would have been different. *Clemans* at 339, citing *State v. Long*, 53 Ohio St.2d 91, 97 (1978).

{¶72} In considering whether the trial court conducted the proceedings before us in such a manner as to deprive Spencer of a fair trial, we note at the outset that the trial court granted and enforced throughout the trial, a motion in limine to limit expert witnesses for either side from expressing to the jury their own determinations as to the credibility of L.N.'s statements. We also note that the trial court granted a defense Crim.R. 29 motion for acquittal as to two counts of the original indictment in this case. And we note that at the close of the trial, the trial court gave a jury instruction specifically directing the jury to disregard any conduct or comment by the trial judge that might have been construed as indicating the judge's view of the facts or favor toward either of the parties.

{¶73} At the same time, we also note some concerns with the manner in which the trial court conducted the trial, particularly with regard to the trial court's active and often spontaneous intervention in defense counsel's examination of various witnesses, including at least one instance in which the court itself interposed an actual "objection" to the statement of a witness and then ruled on its own objection in front of the jury as to a matter that was not raised or objected to by counsel for the state. We can readily conclude that the trial court's interjection

of its own objection on behalf of the prosecution in this instance was clearly erroneous and improper.

{¶74} However, in his brief to this court, Spencer specifically cites, either by excerpt or transcript reference, some forty-five spontaneous interjections, comments to defense counsel and/or rulings by the trial court during the testimony of various witnesses at trial, which Spencer describes as inappropriate or disparaging to defense counsel in front of the jury. Our own review of the trial transcript reveals some seventy-five or more instances of spontaneous interjection and/or comment by the trial court during the examination of witnesses by both counsel, albeit during a six-day jury trial and covering some two thousand pages of transcript.

{¶75} In order to determine the prejudicial effect, if any, from these interjections, we have examined the entire context of each of these instances, including those not specifically raised in Spencer's brief. In conducting this review, we have found that the vast majority of these interjections seem directed at keeping witnesses and counsel on track with the precise statements made by the witness thus far in the testimony and not letting defense counsel, or the state for that matter, 1) mischaracterize a witness' response to a previous question by counsel rephrasing that response in more favorable terms, as counsel framed the next question to the witness or 2) failing to let the witness complete an answer

before asking the next question—both fairly common tactics often employed by trial counsel for either side in criminal cases—and tactics which the trial court would have every right to limit in any trial.

{¶76} A second broad category of trial court interjections in this case arise from the trial court limiting counsel in some way based upon the judge's own assessment of 1) what was relevant to the issues and charges in the case, 2) what the witness was qualified to say or not qualified to say, such as not letting counsel lead the witness into hearsay testimony that the witness would have no way of personally knowing, or 3) not letting the testimony stray into whether the witness personally believed something about the case or personally believed what someone else or another witness said about a matter relevant to the case—again all fairly common ground in any criminal trial and within the trial court's discretion to control—albeit perhaps more commonly in response to an objection from opposing counsel as opposed to being raised *sua sponte* by the trial court without such objection.

{¶77} The primary issue Spencer raises with regard to these interjections beyond the mere *sua sponte* nature of the interjections alone, centers upon the admonitions, comments and remarks the trial court often made directly to defense counsel along with the interjections. In conducting our own review of these interjections in the context of the trial and what was going on with each witness at

the time, it is our conclusion that while perhaps overly aggressive and pre-emptive, and certainly annoying to trial counsel, the behavior of the trial court in this case is more about the chosen style of certain judges in conducting a jury trial, rather than the substantive deprivation of any legal rights during this trial.

{¶78} In this regard, we note that many of the trial court's *sua sponte* interjections involved the prosecution's examination of a witness as well as examinations by defense counsel. And we note that probably the most lengthy and acrimonious exchange between court and counsel during the trial, albeit largely not in front of the jury, took place between the trial judge and counsel for the state.

{¶79} In conclusion, we do not necessarily condone the aggressive and *sua sponte* style of the trial court with regard to its intervention into the examination of witnesses by counsel for either side in this case. In addition, we regard this approach in general, and in many of the instances in this case, as carrying an unnecessary and problematic risk of cumulatively jeopardizing substantive rights in a difficult and lengthy criminal trial on a subsequent appeal.

{¶80} At the same time, despite the one instance of clear error noted earlier, where the court actually interposed its own *sua sponte* objection and ruling, we cannot say in this case that these interjections, either individually or cumulatively, went so far beyond the legitimate scope of the discretion and prerogative of a trial

court in conducting a jury trial, so as to constitute prejudicial error and thereby deprive the defendant of a fair trial under the standards of review set forth earlier.

{¶81} Accordingly, the second assignment of error is overruled.

*Fourth Assignment of Error*

{¶82} In his fourth assignment of error, Spencer argues that cumulative errors committed during the trial deprived him of a fair trial and require a reversal of his convictions and sentence.

{¶83} Under doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, at ¶ 222–224; *State v. Garner*, 74 Ohio St.3d 49, 64 (1995).

{¶84} Based upon our review of the record, we conclude that Spencer received a fair trial. Therefore, the doctrine of cumulative error is not applicable in the present case. Moreover, none of the errors committed in this case, when considered either individually or cumulatively, resulted in prejudicial error. Accordingly, Spencer's fourth assignment of error is overruled.

{¶85} For all these reasons the judgment of the trial court is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**
**/jlr**