CITY OF HAMILTON, Appellee,

v.

CLEMANS, Appellant.

[Cite as *Hamilton v. Clemans* (1997), 121 Ohio App.3d 337.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA96–04–073.

Decided June 2, 1997.

*Samuel D. Borst*, Hamilton City Prosecuting Attorney, for appellee.

*Derek W. Gustafson*, for appellant.

KOEHLER, Judge.

Defendant-appellant, Eddie Clemans, appeals his conviction in a Hamilton Municipal Court jury trial for importuning. We reverse and remand.

The charge stemmed from a May 2, 1995 incident which occurred between appellant and fifteen-year-old Joey L., the stepson of appellant's stepbrother. Appellant took Joey and another boy to a Cincinnati Reds game on the evening in question. After dropping the other boy off, appellant told Joey, an avid baseball card collector, that he wanted to take Joey to appellant's house to see some baseball cards and World Series photographs.

While the two were in appellant's bedroom looking at the cards, Joey stated that appellant asked Joey to do him a favor. Joey alleged that appellant "asked me if he could suck my dick." Joey indicated that he ran from appellant's house and called his mother from a nearby store to come and pick him up.

Appellant was charged, tried and convicted as stated above. On appeal, appellant raises the following assignment of error:

"The trial court committed prejudicial error in its questioning of appellant."

Appellant argues that he was denied a fair trial because the trial judge demonstrated bias, prejudice and hostility toward him, cross-examining appellant

in a manner that clearly implied to the jury that the court believed appellant was not being truthful.

■ Under Evid.R. 611, the court has discretion to control the flow of a trial. This discretion includes the ability to question witnesses and participants. Evid.R. 614. Upon review, therefore, an appellate court must determine whether the trial court's questions and comments constituted an abuse of discretion. *State v. Prokos* (1993), 91 Ohio App.3d 39, 44, 631 N.E.2d 684, 687. .

■ In a trial before a jury, the trial court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate its opinion to the jury. *State ex rel. Wise v. Chand* (1970), 21 Ohio St.2d 113, 119, 50 O.O.2d 322, 325–326, 256 N.E.2d 613, 617. If the intensity, tenor, range and persistence of the trial court's questions or comments can reasonably indicate to the jury the court's opinion as to the credibility of the witness or the weight to be given to his testimony, the interrogation is prejudicially erroneous. *Id.*, paragraph four of the syllabus.

■ As a threshold matter, we observe that none of the trial court's questions or comments were objected to by appellant's counsel at trial. Any errors not brought to the attention of the trial court by objection or otherwise are waived and may not be raised on appeal unless they rise to the level of plain error. *State v. Williford* (1990), 49 Ohio St.3d 247, 251, 551 N.E.2d 1279, 1282–1283. To constitute plain error, it must appear from the record that an error occurred and that except for that error the outcome of the trial would have been different. *State v. Long* (1978), 53 Ohio St.2d 91, 97, 7 O.O.3d 178, 181, 372 N.E.2d 804, 808.

At the trial, Joey testified to the encounter between appellant and himself. Appellant's mother was also called as a witness, and testified that prior to the trial, appellant asked her at his house one day to tell Joey's parents that appellant would pay them $3,000 to drop the charges. Appellant then testified to a differing version of what happened between him and Joey, setting up a credibility question to the jury between appellant and the alleged victim.

The following quotations from the record are illustrative of the questions and remarks of Judge Conese during appellant's cross-examination:

"A. (by the Court): By surprise, no one has asked you this, so I'm going to ask you. Betty Ratliff, is your mother, right?

"A. (appellant): Yeah, that's correct.

"Q. She came in and said you called her over to your house about this situation. That you were feeling bad about the situation. That you brought up the conversation about what was said. * * * And then she was specific that you

had indicated to go talk to these people and that you would offer them money, fairly large sums of money to drop the charges. You heard her testimony, right?

"A. Yes, that's correct.

"Q. Did that conversation take place?

"A. A conversation similar, but * * * she don't have it exactly what was said, no.

"Q. What exactly was said to you by your mom?

"* * *

"A. I told my mother. I said, I took Joey to the ball game. He wanted to see baseball cards. I said I brought him back here. * * * I said Joey went home and told Mike and Darlene that I was trying to bother him. * * * I said mom, he went home and told, told Mike and Darlene that I had asked him if I could suck his dick. And if I wanted to screw him in the butt. And I said I don't know what's going on. I also told my mother that they have acted very strange and they are trying to blackmail me. They are trying to extort money from me.

"Q. You told all of this to your mom?

"A. Yes.

"Q. Why didn't she say it here, do you know?

"A. I have no idea. ·

"Q. Did you tell her specifically to go and offer them thousands of dollars to drop the case?

"A. No.

"Q. Do you know why she would be lying here today?

"A. I don't think she's deliberately lying. Maybe she's confused about things that was said.

"Q. How would she confuse the two things that you're describing. You telling her that their [sic] trying to extort money from you and her coming out with the impression you are trying to bribe them. Which is I'll give them thousands of dollars if they drop the case. * * *

"A. Because I told my mother that ever since these allegations have even started. Before they got blown out of proportion that they wanted to borrow money from me. They wanted my money ever since I . . .

"Q. She got the impression, the distinct impression that she was the girl carrying the message from you to them which she did, she said. And told them, if they were to drop [the] charges, it was worth thousands of dollars * * *.

"A. She may of [sic] got that impression when I told her.

"Q. Who [*sic* ] would she of gotten that impression?

"A. That they told me that if I would give them half of my lottery money when I won the Ohio State Lottery, last, right this fall. I won the Ohio State Lottery.

"Q. You know what?

"A. What?

"Q. For the second time, I'll caution you to be responsive to my question. Turning to the jury and just filling them in with little side notes. I won the Ohio State Lottery this fall, really, I did. That's not responding to my question. I want to know how she got the impression that you * * * offered these people money which she reports to have done. * * * How did she get that impression? * * * You're not allowed to then turn and look at the jury and start filling them in on background. Just answer the question. Which is what did you say to her about the lottery and them asking for some money? You can tell me that but don't take a sidebar and start talking to the jury about that. That's not appropriate. * * *

"A. She told me that Darlene had made the word and Mike that no matter what happens here today in Court on these criminal charges * * * that Darlene and Mike was [*sic* ] going to go file a civil law suit. That they was [*sic* ] going to get money from me one way or the other.

"* * *

"Q. She already talked to them before she talked to you?

"A. Yes.

"Q. And she told you this information about how they were going to do this?

"A. Yes.

"Q. And then somehow she got the impression from the conversation that it was worth money to you, to get them to drop the case?

"A. I suppose, yes, I told her, I said I don't have any more lottery money. I wouldn't pay it if I did. I said, she had offered also.

"Q. That's not consistent with her version which is, it's worth thousands of dollars to me if you get them, tell them to drop the case. Your [*sic* ] telling me you said you wouldn't pay them anything. She's saying you said you did. And I'm trying to understand how that could, the miscommunication could take place.

"A. Well, one time when we was [*sic* ] there, we were still talking when my brother turned the corner and I took [*sic* ]. She said if they turn the corner, they are on their [*sic* ] way out of here. If they turn the corner, you just go on and

drop me off at the corner or circle the block and drop me off. And that's what I did. Maybe during the excitement, she didn't understand that.

"Q. Any other questions of this witness?

"A. (by defense counsel Dan Hurr): No sir.

"A. (by prosecutor Sam Borst): No."

Upon review of the entire record, including the above quoted excerpt, this court concludes that the trial court demonstrated sufficient prejudice against appellant to influence the jury's conclusion on appellant's credibility, thereby committing plain error. See *Chand,* 21 Ohio St.2d at 119, 50 O.O.2d at 325–326, 256 N.E.2d at 617; *State v. Long,* 53 Ohio St.2d at 97, 7 O.O.3d at 181, 372 N.E.2d at 808. Accordingly, we hold that appellant was denied a fair and impartial trial. See *Surgeon v. Surgeon* (1956), 165 Ohio St. 233, 59 O.O. 307, 135 N.E.2d 267. Appellant's assignment of error is sustained. Accordingly, appellant's conviction is reversed, and this cause is remanded to the Hamilton Municipal Court for further proceedings.

*Judgment accordingly.*

WILLIAM W. YOUNG, P.J., and WALSH, J., concur.