[Cite as *State v. James*, 2017-Ohio-7861.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 2016CA00144 |
| | : | |
| VARLONUS JAMES | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Stark County Court of
                                 Common Pleas, case no. 2015CR2009



JUDGMENT:                        AFFIRMED



DATE OF JUDGMENT ENTRY:          September 26, 2017



APPEARANCES:

For Plaintiff-Appellee:                    For Defendant-Appellant:

JOHN D. FERRERO, JR.                       EUGENE M. CAZANTES
STARK CO. PROSECUTOR                       101 Central Plaza S., Ste. 1000
RONALD MARK CALDWELL                       Canton, OH 44702
110 Central Plaza S., Ste. 510
Canton, OH 44702-1413

*Delaney, P.J.*

{¶1} Appellant Varlonus James appeals from the judgment entry of conviction and sentence entered in the Stark County Court of Common Pleas on May 19, 2016. Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶2} This case arose on December 12, 2015 when victim Jane Doe went to appellant's apartment for a party. After other guests left, appellant held Doe against her will for several hours and beat and raped her. The following facts are adduced from the record of appellant's jury trial.

### *Doe Attends a Party*

{¶3} Doe and appellant knew each other for some length of time. Their relationship was described as casual and the two had been intimate in the past but not recently. On December 12, 2015, appellant's friend brought Doe and a female friend to appellant's apartment on Arch Street in Alliance. Doe's friend left shortly after arriving, but two others were present in addition to appellant and Doe: "Bob" and "Peggy." The group drank beer and listened to music. Bob and Peggy smoked crack cocaine; Doe testified she took two hits from the crack pipe but there was not enough substance left in the pipe to get her high. At some point she and Peggy briefly left the apartment to buy cigarettes and crack. Doe testified appellant drank vodka and smoked crack, causing him to behave erratically and pace around the apartment.

{¶4} Throughout the party, appellant repeatedly asked Doe to come into the bedroom with him and she refused. Bob told appellant to leave Doe alone.

{¶5} Around 2:00 a.m., appellant came into the bathroom where Doe was and told her Bob and Peggy had left, so they could go into the bedroom now. Doe again refused and the two returned to the living room and sat on the couch, listening to music. Doe picked up her cell phone intending to Google the singer they were listening to. Appellant became enraged; he grabbed the cell phone and threw it at the door. Doe picked up the phone and saw the screen was cracked. Doe was shocked because she had never seen appellant angry or violent before. She testified she believed appellant was angry because he thought she wanted to call someone for a ride home.

{¶6} Doe reached down to pick up her phone case from the floor, and appellant grabbed her by the neck and began beating her and choking her. He forcefully pushed her onto the couch and grabbed the phone and bent it back and forth. Doe grabbed at appellant in an attempt to get him off her and ripped his sweater. Appellant squeezed her neck hard, choking her, and hit her in the face.

{¶7} Doe could not breathe or talk but tried to get away. Appellant called her "horrible names" as the assault continued, and made statements such as "everyone in town has had a piece, now I'm getting one;" "you're going to die being my wife;" "you think I'm a game but I'm not one to play with;" and "you'll see your kids in heaven." Appellant punched Doe repeatedly in the face. She testified the assault went on for about three hours.

{¶8} Doe's face was bleeding profusely and she wiped a bloody handprint onto the wall while on her knees. At one point she wiped blood off herself with a towel. Finally appellant told Doe she had five seconds to take her clothes off and he started counting down backwards. Doe testified appellant raped her vaginally and the sexual assault

transpired over five minutes, on the couch in the living room. Appellant did not ejaculate. He suddenly jumped off her, stating "what have I done?" Appellant hugged and kissed Doe, telling her he was sorry.

{¶9} Doe pretended "everything was all right" in an attempt to get out of the apartment. She told appellant no one needed to know what happened and "it was fine." Appellant asked her if she wanted anything and she asked for cigarettes. Appellant got his wallet out to count money and told Doe to get dressed.

{¶10} The two left the apartment and walked to a nearby Walgreen's drugstore that was open for business, even though it was early in the morning. Doe told appellant she couldn't go into the store looking visibly beaten, so he went into the store alone to buy cigarettes. Doe watched him inside the store and saw him get in line at the cash register. She took off running toward the nearby Alliance Community Hospital parking lot, where she saw two people getting into their cars.

*Doe Seeks Help*

{¶11} Eric Morrison is a nurse at Alliance Community Hospital and had just completed his shift. He walked out with a co-worker and they were both getting into their cars when a woman came running "frantically" across a grassy area bordering the parking lot. The woman ran up and tried to get into Morrison's car; at first he locked the doors because he didn't realize what was happening. The woman said "this guy is trying to kill me" and Morrison saw a black male coming toward them across the grassy area, holding out a pack of cigarettes.

{¶12} Morrison walked around his car with Doe hovering behind him as he listened to her story. He described Doe as distraught, obviously injured, and very scared.

Appellant approached and tried to give Doe the cigarettes, speaking to Doe continuously but Morrison couldn't understand what he was saying because appellant seemed to have a speech impediment. Morrison felt the situation was dangerous and signaled to his co-worker in the other car to call hospital security and 911. Morrison tried to encourage appellant to leave but he was adamant about speaking to Doe.

{¶13} Morrison described Doe as afraid for her life and crying. He observed apparent serious injuries including multiple bruises on the left side of her face, abrasions, and scratches on her neck as if she had been choked. Morrison remained with Doe until police and security arrived.

*Investigation, Search, and Statements*

{¶14} Ptl. Donald Bartolet of the Alliance Police Department responded to the parking lot and observed Doe with a badly swollen left eye, red marks, and scratches on her face and torso. Doe appeared to have been badly beaten. Hospital security advised Bartolet she had been held by appellant for some length of time before she was able to get away, and she had been sexually assaulted.

{¶15} Appellant told Bartolet that Doe was crazy and had attacked him; he tapped the hood of the police cruiser to demonstrate how he "barely" struck her to get off him. Bartolet told appellant Doe's injuries were too significant to support his story. Bartolet noticed blood on appellant's hands. He cuffed appellant, secured him in the cruiser, Mirandized him, and called a detective to the scene. Bartolet's conversations with Doe and appellant were captured on his point-of-view camera and a DVD was played at trial as appellee's Exhibit 3.

{¶16} Bartolet's interaction with Doe was quick because she needed to be transported by ambulance to Aultman Hospital, despite the fact that she was found in the parking lot of Alliance Community Hospital. Bartolet explained that the extent and severity of her injuries mandated transport to Aultman Hospital. Additionally, the allegation of sexual assault required transport because Alliance does not have a sexual-assault nurse examiner. Bartolet photographed Doe, who remained upset and crying. She was holding her face but Bartolet could see that her left eye was completely swollen shut.

{¶17} Bartolet transported appellant back to the apartment and appellant consented to a search. Inside the apartment, police found evidence consistent with Doe's account, including a bloody handprint on the wall, a significant bloodstain on the couch cushion, a woman's broken fingernail, a bloody towel, a torn shirt, and a broken cell phone. Police took photos and samples of blood throughout the small apartment.

{¶18} Appellant was interviewed at the Alliance Police Department by Detective Shatzer and a DVD of the interview was introduced as appellee's Exhibit 4. Appellant denied striking Doe but admitted putting his hands around her throat, purportedly to get her off him. Appellant said this accounted for the blood on his hands. Despite appellant's allegations that Doe assaulted him, Shatzer found no injuries other than scratches on his chest consistent with the tear in his shirt. Appellant claimed Doe's eye was not injured when they left the apartment to get cigarettes. At various points in the interview, appellant acknowledged he and Doe were the only occupants in the apartment while the assault occurred, but other times he implied another person was present who may have caused Doe's injuries, but he was unable or unwilling to identify that person. He admitted they had intercourse, although he said it was consensual, and he denied being forceful with

Doe. He claimed the blood on the towel came from Doe's bloody nose. When confronted by Shatzer with the fact that there was too much blood throughout the apartment to have come from a bloody nose, appellant insisted he did not punch Doe and only struck her lightly with an open palm because she had a "crack fit."

{¶19} In the meantime, that morning Doe was transported to Aultman Hospital where she was found to have a broken nose and a concussion. She was in pain from a broken bone in her face. She made contact with a sexual assault nurse examiner (SANE) and told the nurse she was raped, but left before a rape exam could be completed. The nurse testified at trial that Doe had to be "medically cleared" before the exam could take place, and the extent of her injuries made everything take longer. The nurse told Doe before she left that she essentially had 72 hours to have the exam to preserve evidence. Doe left the hospital, though, because she had a ride and was worried how she would get back to Alliance.

{¶20} Doe did return to Aultman on December 14 and a second SANE nurse, Kimberly Heffner, was able to complete a rape kit. Heffner testified she documented Doe's injuries including abrasions and bruising to her neck, chest, and wrist; a swollen and bruised tongue; fingernails ripped off;[1] a swollen nose; and her left eye was bruised and swollen to the extent that medical personnel could not open it. Heffner did not observe any vaginal injuries but she testified this is not uncommon in a rape exam and is not dispositive of whether the subject was sexually assaulted.

---

[1] Heffner testified Doe had the type of artificial nails which are cemented onto the nail bed, not "press-on" nails. Heffner estimated it would take significant force to rip the nails off.

{¶21} Evidence collected from appellant's apartment, the rape kit, the parties' D.N.A. standards, and their clothing was submitted to B.C.I. for forensic analysis. D.N.A. analysis indicated Doe's blood was on appellant's hands and the apartment wall. Other samples were inconclusive.

{¶22} One witness testified for the defense at trial, a friend of appellant's with whom he used to live. The witness testified he had a party "4 or 5 years ago," both appellant and Doe attended, and they seemed to know each other.

{¶23} Appellant did not testify on his own behalf.

*Indictment, Trial, and Conviction*

{¶24} Appellant was charged by indictment as follows: one count of rape with a repeat violent offender specification pursuant to R.C. 2907.02(A)(1) and 2941.149, a felony of the first degree [Count I]; one count of kidnapping with a sexual motivation specification and a repeat violent offender specification pursuant to R.C. 2905.01(A)(3) and/or (A)(4), 2941.147, and 2941.149, a felony of the first degree [Count II]; one count of felonious assault with a sexual motivation specification and a repeat violent offender specification pursuant to R.C. 2903.11(A)(1), 2941.147, and 2941.149, a felony of the second degree [Count III]; and one count of disrupting public services pursuant to R.C. 2909.04(A)(1), a felony of the fourth degree [Count IV].

{¶25} Appellant entered pleas of not guilty and the matter proceeded to trial by jury. The repeat violent offender specifications were bifurcated and heard separately by the trial court. Appellant moved for judgment of acquittal pursuant to Crim.R. 29(A) at the close of appellee's evidence and at the close of all of the evidence; the motions were

overruled. Appellant was found guilty as charged and sentenced to an aggregate prison term of 38 years. The trial court also designated appellant a Tier-III sex offender.

{¶26} Appellant now appeals from the judgment entries of his convictions and sentence.

{¶27} Appellant raises five assignments of error:

**ASSIGNMENTS OF ERROR**

{¶28} "I. THE APPELLANT WAS DENIED A FAIR TRIAL DUE TO PREJUDICIAL INTERRUPTIONS BY THE TRIAL COURT."

{¶29} "II. THE TRIAL COURT ERRED BY IMPROPERLY ADMITTING HEARSAY TESTIMONY."

{¶30} "III. THE APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL."

{¶31} "IV. THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."

{¶32} "V. THE TRIAL COURT ERRED IN NOT FINDING THE CHARGES OF RAPE AND KIDNAPPING TO BE ALLIED OFFENSES AND MERGING THOSE COUNTS FOR SENTENCING."

**ANALYSIS**

I.

{¶33} In his first assignment of error, appellant argues interjections by the trial court prejudiced the jury and denied him a fair trial. We disagree.

{¶34} During a jury trial, the comments and manner of the trial court may have a strong impact on the jury. If the trial court's comments rise to the level of prejudicing the jury, the defendant is denied a fair trial. The conduct of the trial court may affect the impartiality of the jury. The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that a criminal defendant shall be tried before a panel of fair and impartial jurors. *State v. Stevens*, 5th Dist. Morgan No. 14 AP 0005, 2015-Ohio-307, ¶ 14, appeal not allowed, 142 Ohio St.3d 1519, 2015-Ohio-2341, 33 N.E.3d 66, citing *State v. Johnson,* 5th Dist. Stark No. 2011–CA–237, 2012–Ohio–3227, ¶ 24.

{¶35} The trial court's control of a trial is circumscribed by statutes and the Rules of Evidence. R.C. 2945.03 states, "[t]he judge of the trial court shall control all proceedings during a criminal trial, and shall limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue." In addition, Evid.R. 611(A) provides that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Evid.R. 614 further permits the court to "interrogate witnesses, in an impartial manner, whether called by itself or by a party."

{¶36} In exercising the duty to control a criminal trial, the trial judge is to remain impartial and refrain from making comments which may influence a jury. *State v. Boyd,* 63 Ohio App.3d 790, 794, 580 N.E.2d 443 (8th Dist.1989). "[T]he judge must be cognizant of the effect of [ ] comments upon the jury [.]" *State v. Wade,* 53 Ohio St.2d 182, 187, 373

N.E.2d 1244 (1978), vacated and remanded on other grounds. "[T]he Court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness." *State ex rel. Wise v. Chand,* 21 Ohio St.2d 113, 256 N.E.2d 613 (1970), at paragraph three of the syllabus. Furthermore, "juries are highly sensitive to every utterance by the trial judge." *Wade* at 188.

{¶37} Appellant in this case argues certain comments by the trial court went beyond the court's power to control the trial and were inappropriate, to the extent that the comments prejudiced the jury.    In deciding whether a trial judge's comments were appropriate, we must determine whether the comments were prejudicial to the defendant's right to a fair trial. *Wade,* 53 Ohio St.2d at 188. "Where a jury might infer the court's opinion of a witness through the persistence, tenor, range, or intensity of its questions, the interrogation is prejudicially erroneous. While the court can ask neutrally phrased questions, its questions should not suggest disbelief in a witness's testimony." *State v. Prokos,* 91 Ohio App.3d 39, 44, 631 N.E.2d 684 (4th Dist.1993), citing *Chand,* supra, 21 Ohio St.2d 113 at paragraph four of the syllabus.

{¶38} Generally, in determining whether a trial judge's remarks were prejudicial: (1)the burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel. *State v. Petrone*, 5th Dist. Stark No. 2011CA00067, 2012-Ohio-911, ¶ 40, appeal

not allowed, 132 Ohio St.3d 1463, 2012-Ohio-3054, 969 N.E.2d 1231, citing *Wade*, supra, 53 Ohio St.2d at 188.

{¶39} An appellate court reviewing a trial court's interrogation of witnesses and comments must determine whether the trial court abused its discretion. *State v. Davis,* 79 Ohio App.3d 450, 454, 607 N.E.2d 543 (4th Dist.1992). However, the failure to object to the content of the judicial statements as being prejudicial to the appellant's rights has been held to constitute a waiver of the error and arguably precludes consideration of the issue upon appeal, for, absent an objection, the trial judge is denied an opportunity to give corrective instructions as to the error. *Wade,* 53 Ohio St.2d at 188, citing *State v. Williams,* 39 Ohio St.2d 20, 313 N.E.2d 859 (1974). Accordingly, any errors not brought to the attention of the trial court by objection or otherwise are waived and may not be raised on appeal unless they rise to the level of plain error. *Petrone*, supra, 2012-Ohio-911 at ¶ 41; *Hamilton v. Clemans,* 121 Ohio App.3d 337, 339, 700 N.E.2d 33 (12th Dist.1997), citing *State v. Williford,* 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990). To constitute plain error, it must appear from the record that an error occurred and that except for that error the outcome of the trial would have been different. *Clemans* at 339, citing *State v. Long,* 53 Ohio St .2d 91, 97, 372 N.E.2d 804 (1978).

{¶40} Without citation to the record, appellant notes a number of interjections by the trial court which he claims to be prejudicial.  In order to determine the prejudicial effect, if any, from these interjections, we have examined the entire context of each of these instances.  See,  *State v. Spencer*, 3rd Dist. Marion No. 9–13–50, 2015-Ohio-52, ¶ 75, appeal not allowed*,* 143 Ohio St.3d 1479, 2015-Ohio-3958, 38 N.E.3d 900.

{¶41} Upon our review of the record, we note the following statements in context:

1) [Defense counsel is cross-examining Jane Doe about her statements to the nurse at Aultman Hospital:]

* * * *.

[DEFENSE COUNSEL]:  Now, you testified previously that you and [appellant] had been intimate and fooled around with one another; is that correct?

[DOE]:  A few times, yeah.

[DEFENSE COUNSE]L:  Pardon me?

[DOE]:  A few times, yes.

[DEFENSE COUNSEL]:  Did you—when you went in, discussing the same medical assessment that we just talked about * * * did [the nurse] * * * ask you if [in] terms of this incident, if you had any sexual relationship with the alleged perpetrator?

[DOE]:  She asked me if—what, that night?  [* * * *.]  That morning?  Yeah, I told her he raped me; she never asked prior.

[DEFENSE COUNSEL]:  Okay.  So if the medical records again, and I don't know if you want to see this, the medical records indicate Patient states she was drinking with a friend and that she has known for three months and she has no prior sexual relationship with, how did the nurse come to that conclusion?

**THE COURT:  Well, objection.  She wouldn't know how the nurse came to that conclusion.  Maybe rephrase it.**  (Emphasis added).

[DEFENSE COUNSEL]:  [Okay.]  Did you state that to the nurse?

[DOE]:  I don't even remember her asking me that.

[DEFENSE COUNSEL:]  So you don't remember saying that at all?

[DOE]:  No, and it's irrelevant anyways.

THE COURT: Okay.  Well, just you didn't remember saying it. The Court will determine what's relevant, okay.

* * * *.

T. I., 209-210.

2)  [Defense counsel is questioning Jane Doe about her testimony on direct that the physical assault went on for about 3 hours and she sustained approximately 30 blows to the head:]

* * * *.

[DEFENSE COUNSEL]:  Now, you testified he was using his fist to hit you?

[DOE]:  Yes.

[DEFENSE COUNSEL]:  And what fist was that?

[DOE]:  Both.

[DEFENSE COUNSEL]:  He was using both fists?

[DOE]:  Yep.

[DEFENSE COUNSEL]:  Was he using both fists equally or was he using one more than the other?

[DOE]:  I don't know.

**THE COURT:  Well, that's kind of hard to determine if you're getting hit.  I mean that's, that's speculative.**  (Emphasis added).

[DEFENSE COUNSEL]:  I'll withdraw the question, Your Honor.

THE COURT:  Yeah, let's ask a new question.

[DEFENSE COUNSEL]:  So at—when all this is happening several hours at some point did somebody come to the door of the building?

[DOE]:  No. * * * *.

T. I., 213-214.

3 and 4)  [Defense counsel questions Jane Doe about what she told detectives about how long the assault transpired and what she said to appellant:]

* * * *.

[DEFENSE COUNSEL]:  And again in speaking with the detective in this matter did you indicate to him how long you were raped?

[DOE]  I just said it was very short.

[DEFENSE COUNSEL]:  Did you tell him that you were raped a couple hours?

[DOE]:  No, I said I was beat a couple hours.

[DEFENSE COUNSEL]: So if his report says otherwise, is that a, a typo on his part?

[DOE]: Apparently.

**THE COURT: She wouldn't know what—whether it's a typo or what his report is. You should ask the officer that if he's brought into court.** (Emphasis added).

[DEFENSE COUNSEL]: I'll withdraw the question, Your Honor.

THE COURT: Okay.

[DEFENSE COUNSEL]: At some time prior to this * * * did you * * * tell him to get it over with? [ ] To just get it over with; were those your words?

[DOE]: I don't know.

[DEFENSE COUNSEL]: May I have one moment, Your Honor?

THE COURT: Sure.

[DEFENSE COUNSEL]: Thank you. [ ]. So is it your testimony, just to clarify, you never told Detective Shatzer that you told him to just get it over with?

[DOE]: For who to get it over with?

[DEFENSE COUNSEL]: That you told [appellant]—

[DOE]: I'm not sure if I did, but if he's raping me, I would hope that he would get it over with.

**THE COURT: Okay. Well, let's calm down. She's already answered that and so we know what—she said she didn't recall during the rape whether she had told him to get it over with or not. (Sic in original). We'll let the detective if he has to testify as to what and what comments may have been, so I think we should go to a, a different question.** (Emphasis added).

[DEFENSE COUNSEL]: So you testified that you were bleeding. Where were you bleeding from?

\* \* \* \*.

T. I., 218-220.

{¶42} Our review of the trial court's statements reveals that they are limited to keeping witnesses and counsel on track with relevant issues in the case, preventing mischaracterization of witnesses' testimony, and keeping heated exchanges from getting out of control, "all fairly common ground in any criminal trial and within the trial court's discretion to control." *Spencer*, supra, 2015-Ohio-52 at ¶ 76. We note with approval the assessment of the Third District Court of Appeals in *Spencer*, in which it reviewed a trial with a greater number of instances of sua sponte interjection than the instant case:

The primary issue [appellant] raises with regard to these interjections beyond the mere *sua sponte* nature of the interjections alone, centers upon the admonitions, comments and remarks the trial court often made directly to defense counsel along with the interjections. In conducting our own review of these interjections in the context of the trial and what was going on with each witness at

the time, it is our conclusion that while perhaps overly aggressive and preemptive, and certainly annoying to trial counsel, the behavior of the trial court in this case is more about the chosen style of certain judges in conducting a jury trial, rather than the substantive deprivation of any legal rights during this trial.

> *State v. Spencer*, 3rd Dist. Marion No. 9–13–50, 2015-Ohio-52, ¶ 78, appeal not allowed, 143 Ohio St.3d 1479, 2015-Ohio-3958, 38 N.E.3d 900.

{¶43} In the instant case, we note the trial court's interjections and sua sponte comments cutting off counsel mid-stream applied to appellee as well. For example, the trial court admonished the victim when she refused to reveal where she and Peggy went to get cigarettes and crack and prevented appellee from asking witnesses to interpret unintelligible portions of the DVDs. (T. I, 223-224, T. II, 70-73).

{¶44} Taken in context, "we cannot say in this case that these interjections, either individually or cumulatively, went so far beyond the legitimate scope of the discretion and prerogative of a trial court in conducting a jury trial, so as to constitute prejudicial error and thereby deprive the defendant of a fair trial under the standards of review set forth earlier." *Spencer*, supra, 2015-Ohio-52 at ¶ 81.

{¶45} The trial court gave a general curative instruction that the jury was to disregard anything the court said or did which they might consider an indication of the court's view of the facts. T. 239. The effect of the jury instruction is to minimize any prejudicial effect the court's comments may have had upon the jurors. *State v. Scott*, 26 Ohio St.3d 92, 96, 497 N.E.2d 55 (1986) (per curiam); *State v. Lucky*, 5th Dist. Delaware

No. 07CAA040018, 2008-Ohio-331, ¶ 50.  The jury is presumed to follow the instructions of the trial court.  *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), paragraph four of the syllabus.  Appellant has not pointed to any evidence in the record that the jury failed to do so in this case.

{¶46} Upon review of the judge's comments in light of the evidence presented to the jury in this matter, we are not persuaded that the outcome of the trial clearly would have gone the other way but for the alleged error.  *State v. Turner*, 5th Dist. Richland No. 2010-CA-0016, 2010-Ohio-5420, ¶ 35.  The remarks at issue, when analyzed in light of the circumstances under which they were made, did not cast an aspersion upon appellant's innocence, the burden of proof or any other fundamental constitutional right of the parties.  Id.  We cannot conclude that the outcome of the trial clearly would have been different but for the comments. Id.; see also, *State v. Woods*, 5th Dist. Richland No. 05 CA 46, 2006-Ohio-1342, ¶ 32; *State v. Evege*, 5th Dist. Ashland No. 99-COA-01287, unreported, 2000 WL 93640, *6–7 (Jan. 21, 1999). Under the circumstances of this case, we find that no plain error was committed.

{¶47} Appellant's first assignment of error is overruled.

II.

{¶48} In his second assignment of error, appellant argues the trial court improperly admitted hearsay testimony.  We disagree.

{¶49} The admission or exclusion of relevant evidence is a matter left to the sound discretion of the trial court.  Absent an abuse of discretion resulting in material prejudice to the defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard.  *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

{¶50} Appellant's argument is premised upon the testimony of Detective Shatzer; specifically, Shatzer's testimony about what Doe told him when he spoke to her in the Alliance Hospital parking lot in the immediate aftermath of the assault and her escape from appellant. We note only once was an objection raised: appellee asked *whether* Doe told him appellant broke her phone; Shatzer stated she did; appellee asked if she told him *why* appellant broke her phone, and appellant objected. The objection was overruled and Shatzer answered Doe was attempting to call for help. (T.II, 50-51).

{¶51} We find the statements by Doe to Shatzer, including about the broken phone, were properly admitted by the trial court as exceptions to the hearsay rule. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hearsay is generally not admissible subject to several exceptions. Evid.R. 802, 803.

{¶52} Appellant summarily argues the statements of Doe admitted through Shatzer are hearsay but appellee responds the statements were properly admissible as excited utterances, and we agree. Evid.R. 803(2) describes hearsay exceptions and defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." A four-part test is applied to determine the admissibility of statements as an excited utterance:

> (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual

impressions and beliefs, and thus render his statement of declaration

spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly

contemporaneous with its exciting cause, was made before there

had been time for such nervous excitement to lose a domination over

his reflective faculties so that such domination continued to remain

sufficient to make his statements and declarations the unreflective

and sincere expression of his actual impressions and beliefs,

(c) that the statement or declaration related to such startling

occurrence or the circumstances of such starling occurrence, and

(d) that the declarant had an opportunity to observe personally

the matters asserted in his statement or declaration.

*State v. Jones,* 135 Ohio St.3d 10, 2012-Ohio-5677, 984

N.E.2d 948, ¶ 166 (citations omitted).

{¶53} The statement need not be made during the course of the startling event. Rather, it is only necessary that the declarant still appeared nervous or distraught and that there was a reasonable basis for continuing to be emotionally upset. In addition, we note that there is no specific amount of time after which a statement can no longer be considered as an excited utterance and not the result of reflective thought. *State v. Taylor,* 66 Ohio St.3d 295, 612 N.E.2d 316 (1993).

{¶54} We find no error in the trial court's admission of Doe's statements to Shatzer; she had firsthand knowledge of the event and the statements were made while she was under the stress of the excitement caused by the sustained assault.  At trial,

Shatzer testified he spoke with Doe very briefly prior to her transport to the hospital; she appeared very badly beaten and was upset and crying. The conversation occurred within minutes of her escape from appellant. We find that the statements to Shatzer were made while Doe was still upset, nervous and distraught over the incident. *State v. Boss*, 5th Dist. Ashland No. 16–COA–026, 2017-Ohio-697, ¶ 27. We therefore concur with appellee that Doe's statements to the detective qualified as an excited utterance because she still remained under the stress of a violent event. Id. at ¶ 28.

{¶55} Appellant's second assignment of error is overruled.

III.

{¶56} In his third assignment of error, appellant argues he received ineffective assistance of counsel. We disagree.

{¶57} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See*, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶58} "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶59} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

*Absence of Motion in Limine*

{¶60} First, appellant argues he received ineffective assistance of counsel because counsel failed to file a motion in limine "to exclude references regarding anger management classes [he] attended during his taped statement to police." Again, appellant fails to cite to the portion of the record where the error is found. See, App.R. 16(A)(7). This omission is significant because in his brief, appellant refers to the recording of his statement made to an officer "captured by the Officer's body cam * * *." (Brief, 13). Appellee's Exhibit 3 is the recording made by Ptl. Bartolet from his point-of-view body camera; appellant argues he made damaging statements about anger management classes during this recording, and counsel was ineffective in preventing the recording from being played for the jury.

{¶61} This argument does not align with events at trial. Appellant actually refers to appellee's Exhibit 4, which is the recording of appellant's statement to Shatzer, which was played during Shatzer's testimony. When appellee asked to play the DVD, the trial court asked whether the DVD had been redacted and defense trial counsel responded he didn't object to playing the DVD because it had been redacted. As the recording played, the prosecutor asked Shatzer to narrate and explain appellant's statements on the tape. This conversation then occurred:

* * * *.

[PROSECUTOR]:  What was he saying there?

[Shatzer]:  That he didn't ball up his fist and hit her, that he has been through anger management and knows he's not supposed to—you know, you're not supposed to hit people with his—with your fists.  But, and my partner actually caught onto this a little bit before I did, you can see him going like this (indicating).

[Defense trial counsel asks to approach and a bench conference ensues.]

[DEFENSE TRIAL COUNSEL]:  I tried to let the anger management part slide before I, before I approached, but I hope we're not going that route again.  They found like a certificate in the house that said like Men's Challenge or it—

[PROSECUTOR]:  I'm not asking anything about that.

[DEFENSE TRIAL COUNSEL]:  Just trying to delay it.

THE COURT:  Let me ask you this.  He's giving his interpretation of the tape.  I don't think he should be doing that.  You can say what he did tell you; do it that way.

* * * *.

[Bench conference ends.]

T. II, 68-69.

{¶62} We have reviewed both DVDs, appellee's Exhibits 3 and 4, and it is not apparent to us which portions were redacted, if any.  Defense trial counsel seemed to

reference a conversation in appellee's Exhibit 3, the Bartolet recording, when officers entered the apartment to search and briefly discussed what they found inside, including a certificate of completion of an anger management course. Again, it is not clear from the record what portion of the video was played. The record indicates the jury heard the conversation between Bartolet and appellant about appellant's consent to search the apartment.

{¶63} Regardless of where the anger-management evidence came from, we perceive appellant's argument here to be that defense trial counsel should have filed a motion in limine to keep it out. The significance of the introduction of two DVDs is that defense trial counsel made some effort to redact portions viewed by the jury but Shatzer's anger-management statement slipped in anyway. Counsel immediately approached and the trial court shut down the line of inquiry. It is not apparent to us from the record what anger-management evidence came in, if any, other than Shatzer's statement above.

{¶64} Additionally, as appellee points out, a motion in limine would have been merely a preliminary ruling on the admissibility of the evidence anyway. As we have explained, the record is too unclear as to what evidence was admitted for us to determine what effect a motion in limine would have had, if any. We are therefore unwilling to find defense trial counsel was ineffective with respect to the issue of anger management references

{¶65} We find appellant has failed to demonstrate trial counsel was ineffective with regard to Shatzer's statement; nor has he established that the outcome of the trial would have been different but for the statement.

*Failure to Object*

{¶66} Appellant's second ineffective-assistance claim arises from defense trial counsel's failure to object when the prosecutor asked Shatzer, "And did he—did she also tell you that then he said you're going to die being my wife?" and Shatzer replied "Yes." (T. II, 113). This question was posed on redirect, after it was established on direct and on cross that appellant had "waited" for Doe for a year and wasn't going to "wait" anymore, i.e. to have a sexual relationship with her.

{¶67} We note defense trial counsel objected to other leading questions. T. II, 72. We are unable to conclude in the context of direct, cross, redirect, and re-cross examinations that trial counsel's failure to object to this single question fell below an objective standard of reasonable representation. *State v. Ward,* 5th Dist. Richland No.2011–CA–100, 2012–Ohio–4807, ¶ 30; see also, *State v. McCoy,* 5th Dist. Richland No.2005–CA–0025, 2006–Ohio–1320; *State v. Rogers,* 5th Dist. Licking No. 07–CA–152, 2009–Ohio–1956. Evid.R. 611(C) provides, "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." The failure to object to leading questions does not usually constitute ineffective assistance of counsel. *State v. Jackson,* 92 Ohio St.3d 436, 449, 2001–Ohio–1266, 751 N.E.2d 946. The failure to object is not a per se indicator of ineffective assistance of counsel because sound trial strategy might well have been not to interrupt. *State v. Gumm,* 73 Ohio St.3d 413, 428, 653 N.E.2d 253 (1995). The failure to object to this question is not ineffective assistance.

{¶68} Appellant has not demonstrated that any claimed deficiencies of trial counsel created "a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different." *Jackson,* supra, 92 Ohio St.3d at 449, citing *Strickland,* 466 U.S. at 694.

{¶69} Appellant's third assignment of error is overruled.

IV.

{¶70} In his fourth assignment of error, appellant argues his convictions are against the manifest weight and sufficiency of the evidence.  We disagree.

{¶71} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.  *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus.  The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶72} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered."  *State v. Thompkins*, supra, 78 Ohio St.3d at 387.

Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶73} Appellant argues generally his convictions for rape, felonious assault, and kidnapping are against the manifest weight and sufficiency of the evidence because Doe made "inconsistent statements" and the D.N.A. test results were inconclusive.[2] He argues specifically that his conviction for disrupting public services is against the manifest weight and sufficiency of the evidence because appellee's evidence does not meet the statutory elements. We will examine each argument separately.

{¶74} With regard to the rape, felonious assault, and kidnapping offenses, appellant points to alleged inconsistencies in Doe's testimony and what she told other witnesses about her history with appellant; specifically, whether they had a sexual relationship in the past. We fail to perceive, and appellant does not explain, the relevance of this information to the convictions. Appellant also points to alleged inconsistencies in the physical evidence, including the facts that appellant had no injuries to his hands despite repeatedly punching Doe in the face and items didn't appear to be out of order in the tiny apartment. We find the physical evidence compelling, however: appellant had Doe's blood on his hands and despite the lack of disarray in the apartment, there was a significant amount of blood in the living room. The large bloodstains on the couch and wall, the bloody towel, the broken phone, and the torn fingernail are compelling evidence corroborating Doe's statements. We also find appellant's arguments that Doe herself

---

[2] Appellant does not challenge his convictions upon the repeat-violent-offender or sexual-motivation specifications.

likely smoked crack that night and appellant did not flee from police to be unpersuasive in light of the amount of incriminating evidence against him.

{¶75} It is axiomatic that the weight of the evidence and the credibility of the witnesses are determined by the trier of fact. *State v. Yarbrough*, 95 Ohio St.3d 227, 231, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. Upon our review of the record, we find appellant's convictions for rape, kidnapping, and felonious assault are supported by sufficient evidence. We further find the trial court did not clearly lose its way and create a manifest miscarriage of justice requiring that appellant's convictions be reversed and a new trial ordered. Appellant's convictions upon those offenses are not against the manifest weight of the evidence.

{¶76} We turn now to appellant's conviction upon one count of disrupting public services. R.C. 2909.04(A)(1) states: "No person, purposely by any means or knowingly by damaging or tampering with any property, shall * * * [i]nterrupt or impair * * * telephone * * * service; police, fire, or other public service communications; * * * being used for public service or emergency communications[.]" "Telephone service" includes both the initiation and receipt of calls. *State v. Brown,* 97 Ohio App.3d 293, 301, 646 N.E.2d 838 (8th Dist.1994). The destruction of even a single private telephone is enough to constitute a violation of R.C. 2909.04. See, *State v. Thomas,* 2nd Dist. Montgomery No. 19435, 2003–Ohio–5746. The statute is aimed at conduct which prevents a victim from using public services to seek emergency assistance. For example, where a defendant grabs the victim's phone and throws it into a toilet, and then removes the battery from a second phone, such conduct "falls squarely within the types of behaviors the statute was

designed to punish: he interrupted telephone use for emergency communications." *State v. White,* 2nd Dist. Montgomery No. 21795, 2007–Ohio–5671, ¶ 15.

{¶77} Appellee's argument at trial was that appellant broke Doe's cell phone to prevent her from "calling for help." (T. II, 207, 209, 212). Shatzer testified several times that Doe told him she was attempting to reach her cell phone to call for help but appellant broke the phone to prevent her from calling police. (T. II, 34, 50-51). Doe's phone was broken and police found it in pieces in the apartment where she said it would be.

{¶78} We have reviewed Doe's testimony regarding the destruction of the phone. Doe testified she initially picked up the phone to google the singer whose music she and appellant were listening to; this was the gesture that initiated appellant's rage and the ensuing assault. Doe speculated he thought she was calling someone for a ride home. During the assault appellant told her it was "rude" to be on the phone when she was spending time with someone. (T. I, 158-159).

{¶79} Further testimony established Doe intended to use the phone to call 911. She further testified as follows:

> * * * *.
>
> [PROSECUTOR]: Did you ever try to get to your phone again after he threw it the first time?
>
> [DOE]: Yeah, that's that—the second time that's when he start—when he bent the phone and I knew it wasn't turning on; I had tried to push the button.
>
> [PROSECUTOR]: And why did you want to get to your phone?

[DOE]: To get help. I was scared.

[PROSECUTOR]: So who would you have called if you would have been able to use your phone?

[Doe]: 911.

* * * *.

[The prosecutor asks Doe to take an object out of an evidence envelope.]

[PROSECUTOR]: * * * *. Can you tell us what that is?

[DOE]: My phone.

[PROSECUTOR]: Okay. Is that the phone [appellant] broke?

[DOE]: Yes.

[PROSECUTOR]: Okay. And [appellant] did that to your phone, correct?

[DOE]: Yes.

[PROSECUTOR]: All right. And that was the phone that you were trying to get to to call 911, correct?

[DOE]: Um-hum.

[PROSECUTOR]: And whenever you attempted to get to that phone he would hit you or choke you?

[DOE]: Yeah. He was like a maniac when he was trying to bend it.

[PROSECUTOR]: Okay.

[DOE]: I knew it wasn't going to work.

* * * *.

T. I, 169-171.

{¶80} In the instant case, appellant argues his conviction must be reversed because there is no evidence he broke the phone with the intention of preventing Doe from calling 911. In *State v. Yoakum,* we held appellee is not required to prove that an actual 911 emergency call was in progress when the telephone was disabled by the defendant throwing it against the wall. 5th Dist. Holmes No. 01 CA005, 2002–Ohio–249, at *2, citing *State v. Brown,* 97 Ohio App.3d 293, 301, 646 N.E.2d 838 (8th Dist.1994). Here, we find sufficient evidence to prove appellant broke the phone to prevent Doe from calling 911.

{¶81} Appellant further argues his conviction fails because "[h]is subsequent alleged attempt to break the phone in half did not affect [Doe's] ability to seek help." We note Doe was able to seek help only after fleeing from appellant after tricking him into leaving the apartment with her to get cigarettes. Doe's successful escape from appellant is irrelevant to whether he disrupted public services. "The statute prohibits purposeful or knowing damaging or tampering with property that interrupts or impairs telephone service." *Thomas,* supra, 2003–Ohio–5746 at ¶ 62. Appellant's conduct here falls squarely within that the statute is designed to prevent.

{¶82} Appellee established appellant committed the conduct prohibited by R.C. 2909.04(A)(1): he grabbed Doe's phone and threw it, breaking it the first time, and then "bent it back and forth," succeeding in completely disabling it. Doe was prevented from calling police or seeking emergency assistance until she could escape from the apartment. See, *State v. Galindo*, 5th Dist. Stark No. 2011CA00258, 2012-Ohio-3626.

{¶83} We have reviewed the record and are satisfied that the jury did not lose its way in resolving any conflicts in the evidence. Appellant's conviction for one count of disrupting public services is supported by sufficient evidence in the record and is not against the manifest weight of the evidence.

{¶84} Appellant's fourth assignment of error is overruled.

V.

{¶85} In his fifth assignment of error, appellant argues the counts of rape and kidnapping are allied offenses of similar import which should have merged for sentencing. We disagree.

{¶86} R.C. 2941.25 states:

>   (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

>   (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶87} Appellant argues his convictions of rape and kidnapping should have merged for sentencing purposes. In *State v. Jackson*, the Ohio Supreme Court instructed Ohio courts to utilize the allied-offenses analysis of *State v. Ruff*, in which the Court

applied a three-part test to determine whether a defendant can be convicted of multiple offenses:

> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.
>
> *State v. Jackson*, 149 Ohio St.3d 55, 2016-Ohio-5488, 73 N.E.3d 414, ¶ 128, reconsideration denied, 147 Ohio St.3d 1439, 2016-Ohio-7677, 63 N.E.3d 157, and cert. denied, 137 S.Ct. 1586, 197 L.Ed.2d 714 (2017), citing *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31.

{¶88} In *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979), at the syllabus, the Ohio Supreme Court established a framework to analyze whether kidnapping and another offense were committed with a separate animus as to each pursuant to R.C. 2941.25(B):

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the

movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

{¶89} The issue in the instant case, therefore, is whether the restraint was "merely incidental" to the rape. The sexual assault was five minutes of a prolonged, lengthy ordeal. Appellant restrained Doe in the apartment for hours, beating her, choking her, and eventually raping her. Upon our review of the record, we agree with appellee that "* * * the duration of [appellant's] restraint of [Doe] subjected her to a substantial increase in the risk of harm to her that was separate and apart from that involved in the underlying crime" of rape.

{¶90} We are convinced appellant committed the rape and kidnapping offenses with separate animus. The offenses, therefore, are not allied offenses of similar import and the trial court properly sentenced appellant on both.

{¶91} Appellant's fifth assignment of error is overruled.

## CONCLUSION

{¶92} Appellant's five assignments of error are overruled and the judgment of the Stark County Court of Common Pleas is affirmed.

By:  Delaney, P.J.,

Baldwin, J. concur and

Hoffman, J., concurs separately

*Hoffman, J., concurring*

{¶93} I concur in the majority's analysis and disposition of Appellant's second, third, fourth and fifth assignments of error.

{¶94} I further concur generally with the majority's analysis of Appellant's first assignment of error and do concur in its decision to overrule it. I write separately only with respect to the one comment by the trial court during cross-examination of Jane Doe regarding the blows she received at Appellant's hand. I am troubled by the trial court's comment, "Well, that's kind of hard to determine if you're getting hit. I mean that's, that's speculative."

{¶95} The majority finds the trial court's "…remarks, at issue, when analyzed in light of the circumstance under which they were made, did not cast an aspersion upon appellant's innocence, the burden of proof or any other fundamental constitutional right of the parties." (Majority Opinion at ¶46 citing *State v. Turner*, 5th Dist. Richland No. 2010-CA-0016, 2010-Ohio-5420, ¶35.)

{¶96} I find this particular comment by the trial court indirectly, if not directly, suggests to the jury it found Jane Doe's testimony regarding the physical assault to be credible. I do not think the trial court did so consciously given its comment "that's speculative."

{¶97} Unlike the majority, I find the trial court's comment did cast an aspersion upon Appellant's innocence as it had the effect, at least indirectly, of vouching for the victim's credibility.

**{¶98}** Nevertheless, I concur with the majority's conclusion we cannot conclude that the outcome of the trial clearly would have been different but for the comments.